### In re DESTINY D. et al.

### No. 2006–20–A.

Supreme Court of Rhode Island.

May 25, 2007.

John E. Sylvia, Esq., for Petitioner Mother.

C. Daniel Schrock, Esq., for Petitioner Father.

Karen A. Clark, Esq., Providence, for DCYF.

Joseph Palmieri, Esq., Providence, for Guardian ad Litem.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court for oral argument on April 5th, 2007, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## Facts and Travel

The events surrounding this heartbreaking case have received considerable media attention and are indescribably tragic. The respondents, Katherine Bunnell (Bunnell) and Gilbert Delestre (Delestre) (collectively respondents), a young Woonsocket couple, were twenty-one and twenty-three years-old at the time of the events described in this opinion. At that time, they had two biological children living with them, Destiny Delestre (Destiny), born on June 9, 2000, and Daziya Delestre (Daziya), born on July 15, 2002. In addition to Destiny and Daziya, Bunnell and Delestre also were caring for three children of Karen Wright, who is Bunnell's sister and who was incarcerated and serving a six-year sentence in another state for trafficking over 5,000 grams of marijuana. These three children were David Bolton, Mickey Wright,[1] and three-year-old Thomas "T.J." Wright (T.J.).[2]

On the night of October 29, 2004, Delestre and Bunnell hired a fifteen-year-old babysitter, Kayla Roderick (Roderick or babysitter), to look after all five children so that they could go out for the evening.[3] According to Roderick, Bunnell and Delestre left at about 7:30 p.m.; Bunnell returned briefly at about 7:50 p.m., before leaving for the evening. Roderick testified that she had some friends over from approximately 8:30 p.m. until 11:30 p.m. The couple did not return until approximately 2:50 a.m. on the morning of October 30th. At that time, Roderick was asleep on the floor and the children were upstairs in bed. According to Roderick, three-year-old T.J. originally had gone to sleep on the couch, but was upstairs when Bunnell and Delestre returned.

Roderick testified that Bunnell and Delestre appeared to have been drinking, and, when they saw that milk and yogurt had been spilled on the carpet, they became angry. Both Bunnell and Delestre started yelling "[w]hat happened to the house? Why is the house a mess?" Delestre ran upstairs and Roderick heard what sounded like slaps. She then heard T.J. begin to cry. Bunnell also ran up-

---

1. The trial transcripts refer to T.J.'s brother as Mickey Wright and so shall we; however, the Department of Children, Youth and Families (DCYF) in its summary of facts in support of its petition for an involuntary termination of parental rights, spells the name Mikey.

2. Tragically, T.J. and his siblings had been placed in foster care with Bunnell and Delestre by DCYF.

3. The events of the evening of October 29th are based on Roderick's testimony at trial and her statement to the Woonsocket police.

stairs and then yelled at T.J. "[w]hat did you do to the house?"

At that point, Roderick testified, Bunnell then came down the stairs carrying T.J. by his arms, with her knee hitting him in the back as she descended; when she got to the bottom of the stairs, she dropped T.J. and he fell on the floor. Bunnell continued to shout while T.J. repeatedly tried to stand up; Bunnell would help him get up and then hit him in the face, back and chest. Finally, as T.J. was lying on the floor, Bunnell poured a quart of milk on him. This brutality continued.

The direct evidence and the inferences drawn from the evidence established that Delestre threw the child in the air. Roderick testified that she saw T.J. flying toward Bunnell, and Delestre's arms were up in the air. T.J. landed on the floor, with one leg under him and the other leg sprawled out; he then curled up, whimpering and crying. Bunnell then brought T.J. to the stairs to sit, so he could stop crying and breathe. In her statement to police, Bunnell indicated that Delestre slapped T.J. in the face and head, so that his lip was bleeding, and that she also struck the child in the head. Roderick estimated that the couple beat T.J. intermittently for between ten and fifteen minutes before Bunnell drove her home.[4] At that time, Bunnell was still visibly angry at T.J. about the mess and was yelling, "[s]wear to God, I swear I'm going to do it again." T.J. later died at Hasbro Children's Hospital because of repeated blunt-force trauma to his head. The manner of death was homicide.

Woonsocket police took statements from Bunnell, Delestre, and Roderick, including a videotaped statement from Delestre. After T.J.'s death, on November 1, 2004, the Department of Children, Youth and Families (DCYF), under G.L.1956 § 15–7–7,[5] petitioned to terminate respondents' parental rights to Destiny and Daziya, alleging that they had committed cruel and abusive conduct toward T.J. and had subjected these children to conduct or conditions seriously detrimental to their well-being.[6]

In addition to the testimony of the babysitter, the court heard testimony from: Domenic Lancellotta (Lancellotta), a child protective investigator for DCYF; Jennifer Jawharjian (Jawharjian), a DCYF social caseworker; Dr. Reena Isaac (Dr. Isaac), an expert in forensic pediatrics; and Woonsocket police detectives, Sergeant Todd A. Brien (Sgt. Brien) and Tony Wood.

After both Delestre and Bunnell had invoked their Fifth Amendment privilege against self-incrimination at trial, Lancellotta testified about statements each defendant made while in custody at the Adult Correctional Institutions.[7] In her state-

---

**4.** Bunnell was stopped for speeding by the Woonsocket police both on the way to Roderick's home and on the way back to her own apartment.

**5.** General Laws 1956 § 15–7–7(a)(2) permits termination of a petitioner's parental rights when the accused is found to be:

"unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

"* * *

"(ii) Conduct toward any child of a cruel or abusive nature;

"* * *

"(v) The parent has subjected the child to aggravated circumstances, which circumstances shall be abandonment, torture, chronic abuse and sexual abuse[.]"

**6.** T.J.'s siblings, Mickey and David, were placed in DCYF care.

**7.** We note that both Bunnell and Delestre are awaiting trial in connection with an indictment arising out of T.J.'s death.

ment, Bunnell admitted that she had slapped T.J. in the face and poured milk on him because he had made a mess in the house. Although Delestre admitted to the Woonsocket police that he abused T.J., he told Lancellotta that he gave a statement to the police only because they promised they would let him go.

Doctor Isaac, who observed T.J. while he was comatose in the emergency room, testified at length about the child's numerous injuries, including head trauma, severe brain injury, facial trauma, and multiple fractures. She testified that in her opinion T.J.'s injuries had occurred within a few hours of her examination and that his injuries were the result of child abuse.

Additionally, a letter from Dr. Anait Azarian (Dr. Azarian), the treating physician to T.J.'s older brother David, was introduced into evidence. It was Dr. Azarian's opinion that it would be detrimental to David's emotional well-being to require him to testify in the termination proceeding about the events that occurred on the night in question.

After a lengthy trial, the Family Court justice found, by clear and convincing evidence, that the injuries T.J. Wright suffered were inflicted by respondents. He found them "unfit by reason of conduct or conditions severely detrimental to the child[,] T.J. Wright[, of] a cruel and abusive nature." The trial justice, citing § 15–7–7(b)(1),[8] held that "[o]nce cruel and abusive behavior is established [DCYF] has no obligation to engage in reasonable efforts to preserve and reunify the family." He then found by clear and convincing evidence that it was in the children's best interest to terminate Bunnell and Deles-

tre's parental rights. The respondents timely appealed.

## Issues

Before this Court, Bunnell and Delestre raise separate points of error. Bunnell argues that the trial justice erred in admitting her prior written statements into evidence after she invoked her Fifth–Amendment privilege against self-incrimination, and further, that he erred in drawing adverse inferences based on her refusal to testify. Delestre argues that the trial justice abused his discretion and violated Delestre's due process rights when he denied Delestre's motion to compel T.J.'s older brother, David, to testify at trial. Delestre also argues that the trial justice was clearly wrong in finding facts sufficient to terminate his parental rights.

## Standard of Review

■ The findings of a Family Court justice in a termination of parental rights proceeding "are entitled to great weight and will not be disturbed unless" the findings are clearly wrong or the trial justice overlooked or misconceived material evidence. *In re Kristen B.*, 558 A.2d 200, 204 (R.I.1989). Natural parents have a fundamental liberty interest in the "care, custody, and management" of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). A finding of parental unfitness, therefore, is "the first necessary step" before a termination of parental rights can occur. *In re Kristina L.*, 520 A.2d 574, 580 (R.I.1987). Before the state may terminate a parent's parental rights, due process requires that the state support its allegations by at least clear and convincing evidence. *In re Antonio G.*, 657 A.2d 1052, 1057 (R.I.1995)

8. Section 15–7–7(b)(1) states in pertinent part:
"In the event that a petition is filed pursuant to subdivision (a)(2)(ii), (a)(2)(iv),

(a)(2)(v), (a)(2)(vi) or (a)(4) of this section, the department has no obligation to engage in reasonable efforts to preserve and reunify a family."

(citing *Santosky*, 455 U.S. at 747–48, 102 S.Ct. 1388). After such a determination, "the best interests of the child outweigh all other considerations." *In re Kristen B.*, 558 A.2d at 203.

### Fifth–Amendment Privilege

■ On appeal, Bunnell argues that the trial justice erred when, after she refused to testify at trial, he admitted her statements to the Woonsocket police into evidence. Bunnell contends that the use of this evidence violated her rights as embodied in the Fifth Amendment to the United States Constitution.[9]

Bunnell argues that the exceptions to the exclusionary protections afforded by § 15–7–7(f)[10] prevented her from giving testimony because any statements or admissions could be admissible in the pending criminal prosecution for T.J.'s death, and, therefore, she contends, her prior statements should have been excluded. Although she correctly cites *Tona, Inc. v. Evans*, 590 A.2d 873, 875 (R.I.1991), for the proposition that the Fifth–Amendment privilege against self-incrimination is available in a civil proceeding, whether or not a criminal proceeding is pending, her contention that the Fifth Amendment precludes the use of her prior statements to the Woonsocket police is erroneous.

■ We note that Bunnell does not argue that the statements she made to the Woonsocket police were involuntarily given, or in any way violated her *Miranda* rights. Although "termination of [one's] parental rights is a significant event in which a parent's due process rights reasonably should be protected[,]"[11] *In re Ginger G.*, 775 A.2d 255, 258 (R.I.2001), it is nonetheless a civil proceeding, and as such, the protections afforded a criminal defendant, as enunciated in *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), do not apply. *See In re Ariel N.*, 892 A.2d 80, 84–85 (R.I.2006) (acknowledging that a termination of parental rights is a civil proceeding, not a criminal one, and the parent has "no absolute right to be physically present"). Here, the trial justice found that Bunnell "knowingly, voluntarily, and intelligently made the statement" and he permitted Sgt. Brien to testify as to the content of the statement under Rule 801(d)(2) of the Rhode Island Rules of Evidence as a *"Statement by Party–Opponent."*[12] We are of the opinion that the trial justice did not err in admitting this evidence which was obtained in connection with the criminal investigation into T.J.'s death.

■ Finally, Bunnell asserts that the trial justice erred when he drew adverse

---

9. The pertinent portion of the Fifth Amendment to the United States Constitution states: "No person * * * shall be compelled in any criminal case to be a witness against himself."

10. Section 15–7–7–(f) states:

"The record of the testimony of the parties adduced in any proceeding terminating parental rights to a child shall be entitled to the confidentiality provided for in § 8–10–21 and more specifically shall not be admissible in any civil, criminal, or other proceeding in any court against a person named a defendant or respondent for any purpose, *except in subsequent proceedings*

*involving the same child or proceedings involving the same respondent."* (Emphasis added.)

11. *See, e.g., In re Ariel N.*, 892 A.2d 80, 84 (R.I.2006) (outlining some minimal protections afforded parents in termination proceedings, nothing that while " 'entirely passive representation' of an absent respondent's interest will not suffice[,]" nonetheless, there is "no right to confrontation").

12. Rule 801(d) of the Rhode Island Rules of Evidence states in pertinent part: "A statement is not hearsay if: * * * (2) * * * [t]he statement is offered against a party and is * * * the party's own statement[.]"

inferences based on her refusal to testify. This argument is without merit. We specifically have stated that in the trial of a petition seeking the termination of parental rights, the Fifth Amendment does not forbid the drawing of adverse inferences against a party who refuses to testify. *In re Rosalie H.*, 889 A.2d 199, 206 (R.I.2006). In this instance, the trial justice quite properly considered Bunnell's refusal to testify "in light of all the other evidence" adduced at trial. *Id.* After reviewing the record and our relevant case law, we are satisfied that the trial justice appropriately admitted Bunnell's statements and did not err if he drew adverse inferences from her refusal to testify.

### Testimony of T.J.'s Brother David

■ In his appeal, Delestre assigns error to the trial justice's refusal to compel T.J.'s ten-year-old brother David to testify at trial. He contends that this decision violated his constitutional guarantee of due process. We do not agree.

At trial, DCYF introduced a letter from David's treating physician, Dr. Azarian, in which she opined that "[t]estifying would be detrimental to the child's emotional well-being" because David "would likely experience flashbacks" and that it would be "devastating [for him] to relive" the events leading up to T.J.'s death. We note that David's guardian *ad litem* also opposed having David testify. Delestre moved to compel the child's testimony, arguing that his interest in having David testify outweighed the state's interest.

The trial justice denied Delestre's motion. He declared that it was the court's obligation to protect David and to act in his best interest and that if there was ever "a case that cried out for * * * protection, it's this case at this time." Having found that the child would be further traumatized, he declined to compel his testimony.

In his brief to this Court, Delestre concedes that there is no constitutional right to confrontation or cross-examination in this, or any other, civil proceeding. This Court previously has held that, although parents enjoy a " 'fundamental liberty interest [with respect to] the care, custody, and management of their child[ren],' * * * [and] are entitled to procedural due process before the termination of their parental rights[,]" the Sixth Amendment right of confrontation [13] relates only to criminal proceedings and is not available in this context. *In re Ginger G.*, 775 A.2d at 257.[14] As such, the trial justice's refusal to enforce the subpoena compelling David to appear and testify was well within his sound discretion and, after reviewing the opinion of Dr. Azarian, we are satisfied that he properly exercised that discretion. *See Maryland v. Craig*, 497 U.S. 836, 855–56, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (holding that, even in the context of a criminal case, the court must consider the best interest of the child and make an evidentiary finding that the child would be substantially traumatized in order to limit a party's right to confrontation). Additionally, we are satisfied that Delestre was not denied his right to due process based on the unavailability of this child witness.

### The Trial Justice's Findings

Delestre also challenges the trial justice's findings of fact and argues that they

---

13. The Sixth Amendment to the United States Constitution reads in pertinent part:
    "In all *criminal* prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." (Emphasis added.)

14. *See also In re Ne–kia S.*, 566 A.2d 392, 397 (R.I.1989) (holding that, in a termination of parental rights case, the "controversy is civil in nature; therefore, the Sixth Amendment is inapplicable").

were not sufficient to support a finding of unfitness and a decree terminating his parental rights. He denies that he hurt T.J. and argues that this contention somehow is supported by the fact that he was intoxicated when T.J. was killed. This argument is without merit.

When called upon to review a decision terminating a parent's parental rights, "this Court examines the record 'to establish whether the [trial] justice's findings are supported by legally competent evidence[,]'" *In re David L.*, 877 A.2d 667, 671 (R.I.2005); these findings will not be disturbed unless they are "clearly wrong, or unless the trial justice overlooked or misconceived material evidence." *In re Unique T.*, 822 A.2d 182, 183 (R.I.2003).

In this case, we are satisfied that the trial justice did not err in finding, by clear and convincing evidence, competent proof to support the termination of Delestre's parental rights in accordance with § 15–7–7(a)(2)(ii), for "[c]onduct toward any child of a cruel or abusive nature." In his decision, the trial justice detailed the testimony of numerous witnesses, including the eyewitness testimony of the babysitter. This evidence was uncontroverted. Based on the expert medical opinion, the eyewitness testimony, and the other evidence, the trial justice found Delestre to be an unfit parent. He further found that once cruel and abusive behavior was established, DCYF was under no obligation to make reasonable efforts to reunify Delestre with Destiny and Daziya. Finally, he found that termination was in the children's best interest. After reviewing the profoundly disturbing record in this case, we are of the opinion that the trial justice's findings are amply supported by the evidence and are correct.

This Court previously has held that "[t]he state's role in protecting [a child] may properly be preventive of harm as well as remedial.' * * * There is no requirement that a court wait until a child is actually harmed before such court provides the protection of the state." *In re Luz J.*, 447 A.2d 1148, 1152 (R.I.1982). We agree with the trial justice that "[i]f ever there was a case that cried out for * * * protection, it's this case at this time."

### Conclusion

For all of the foregoing reasons, we affirm the Family Court decree terminating the parental rights of the respondents, Katherine Bunnell and Gilbert Delestre. The record shall be remanded to the Family Court.