**Supreme Court**

No. 2011-342-Appeal.
No. 2012-22-M.P.
(07-4022-2)

In re Amiah P.                     :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2011-342-Appeal.
No. 2012-22-M.P.
(07-4022-2)

In re Amiah P.                              :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** This case came before the Supreme Court on September 25, 2012, on writ of certiorari by Harry Harris (respondent-father) and on appeal by Caitlin Patenaude (respondent-mother) (collectively, respondents), from a decree entered in the Family Court terminating their parental rights to their daughter, Amiah P., who was born on June 27, 2009.[1] The parties were directed to appear and show cause why the issues raised in this appeal should not summarily be decided.[2] After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time.

For the reasons set forth in this opinion, we affirm the decree of the Family Court.

**Facts and Travel**

On September 22, 2010, the Rhode Island Department of Children, Youth and Families (DCYF) filed a petition in the Family Court seeking to terminate the parental rights of respondents with respect to Amiah. In its petition, DCYF alleged the following grounds for terminating the parental rights of respondent-mother: that she was unfit by reason of conduct or

[1] The trial transcripts refer to the child as "Amiah" and so shall we; however, the name is spelled "Amilah" at times in the record.

[2] When it granted respondent-father's petition for writ of certiorari, the Court consolidated these two cases.

conditions seriously detrimental to the child; that the child had been placed in DCYF's custody or care for at least twelve months; that respondent-mother had a chronic substance-abuse problem and her prognosis indicated that the child would not be able to return to her custody within a reasonable period, considering the child's age and the need for a permanent home; that respondent-mother had exhibited conduct or behavior seriously detrimental to the child of such a duration to render it improbable that respondent-mother could care for the child for an extended period. See G.L. 1956 § 15-7-7(a)(2)(iii), (iv). As to respondent-father, DCYF alleged that he was unfit by reason of conduct or conditions seriously detrimental to the child, such as institutionalization, including imprisonment, of such a duration as to render it improbable for the father to care for the child for an extended period and that respondent-father abandoned the child. See § 15-7-7(a)(2)(i), (a)(4). Concerning both parents, DCYF alleged that respondents had been offered or received services to correct the situation that led to the child's placement. See § 15-7-7(a)(3).

The DCYF's involvement in this case began on June 29, 2009, only two days after Amiah tested positive for cocaine at birth. On that date, DCYF filed a neglect petition against respondent-mother concerning Amiah.[3] Subsequently, a paternity test established that respondent-father, who was incarcerated at the Adult Correctional Institutions (ACI) at that time, was, in fact, Amiah's father. On April 15, 2010, a decree was entered as to both parents finding Amiah neglected.

A trial on the termination of parental rights was held before a justice of the Family Court on April 26, May 16, and May 31, 2011. Jennifer Jawharjian (Ms. Jawharjian) testified that she

---

[3] The record reflects that both mother and baby tested positive for cocaine and that the father was unknown at the time of the child's birth. We also note that respondent-mother previously has had her parental rights to one child terminated involuntarily, and yet another child of respondent-mother's was removed by DCYF after she gave birth while incarcerated at the Women's Center at the Adult Correctional Institutions. That child is not involved in the instant appeal.

was assigned to Amiah's case in December 2009.[4]  At that time, case plans were in place for respondent-mother and respondent-father.  The respondent-mother's case plan included the following tasks:  participate in a parenting program, obtain housing, seek employment, attend counseling, remain substance-free, and attend weekly supervised visits with Amiah.  The respondent-father's case plan centered on addressing his parenting skills and encouraged participation in the programs offered at the ACI.  That case plan was mailed to respondent-father.

Ms. Jawharjian learned the identity of Amiah's biological father sometime in February or early March 2010.  Biweekly visitation with Amiah at the ACI was initiated at that time.  The respondent-father was advised to participate in as many programs offered at the ACI as possible.  Thereafter, respondent-father provided Ms. Jawharjian with his certificates from parenting, domestic violence, and substance abuse programs.  Ms. Jawharjian indicated that she maintained contact with respondent-father and provided him with information about Amiah's progress and well-being.

Meanwhile, in March 2010, Ms. Jawharjian spoke with respondent-mother, whom she encouraged to seek shelter at a domestic violence center because she was engaged in yet another abusive relationship.  Ms. Jawharjian and respondent-mother also discussed moving respondent-mother into a residential treatment program to address her substance abuse.  At that time, respondent-mother acknowledged to Ms. Jawharjian that it was doubtful that she would be able to care for Amiah given her persistent and chronic problems stemming from substance abuse.  Later, on June 25, 2010, Ms. Jawharjian informed respondent-mother that DCYF intended to file a termination petition based on her failure to make sufficient progress toward reunification.  As

---

[4] Previously, another caseworker had been working on Amiah's case; that caseworker had created a case plan for respondent-mother that remained in force at the time Ms. Jawharjian was assigned to this case.

to respondent-father, Ms. Jawharjian indicated that he did not engage in behavior at the prison that would cause him to be denied visitation with Amiah, that the visits went "okay," that some bonding between respondent-father and the baby had developed, and that he provided Christmas gifts for his daughter.

However, according to Ms. Jawharjian, Amiah was bonded with her non-relative foster family: Amiah had lived with her foster family since birth, and, Ms. Jawharjian noted, Amiah considered her foster mother to be her mother and her foster siblings to be her own siblings. Ms. Jawharjian characterized Amiah as a "happy, healthy, young girl." The child's foster family wanted to adopt her, but did not want an open adoption.[5]

When respondent-father testified, he indicated that he enjoyed his visits with Amiah, whom he described as his "little pride and joy," and that he wanted to raise her in spite of the fact that he had never lived with her. He testified about his participation in the GED program and his successful completion of a Spectrum Health Systems drug program, anger management programs, meditation and stress reduction programs, an HIV-prevention course, and a parenting class. He went on to discuss his newfound religion and subsequent baptism, as well as his participation in the Learning To Live Initiative, which focuses on reading and understanding the Bible. He indicated that he engaged in these programs principally for case-planning purposes: "[t]hat way [], when [he] did come to court * * *, [the court] won't terminate [his] rights," and he "wanted to have a chance at least with [his] daughter."[6]

---

[5] Ms. Jawharjian testified that she explored the option of placing Amiah with relatives, but because of criminal histories and other factors concerning these relatives, Ms. Jawharjian declined to do so.

[6] The respondent-father also testified about his son, aged thirty-three and living in New York. He indicated that he has kept in touch with his son after raising him with the son's mother. There is no other evidence in this record about this relationship.

In terms of any future planning for Amiah, respondent-father had little to offer; he stated that he planned to call his caseworker to see what programs or counseling he ought to complete. Further, he testified that, while in prison, he was in touch with his landlady, who told him she would give him a two-bedroom apartment upon his release from prison. He also stated that a friend would give him a job in an auto body shop. As for raising Amiah, respondent-father said his six sisters, who have children of their own, would assist him in caring for the child.[7] Specifically, according to respondent-father, he has "six sisters who [have] kids who will help [him] raise [his] daughter, and they have no problem with that." Further, he testified that he has a niece who is DCYF-licensed and who "will take [the child] now."

With regard to his criminal history, respondent-father testified about the number of times he was sentenced to prison, including four years beginning in 1988, one year in 1992 for possession of cocaine, six years beginning in 1996 for delivery of cocaine, six months in 2003, and a ninety-day stint in 2007 for driving on a suspended license. He also indicated that his current incarceration came about from a plea of <u>nolo</u> <u>contendere</u> to felony domestic assault against respondent-mother in November 2008. He received a twelve-year sentence at the ACI, six years to serve and six years suspended, with probation. According to respondent-father, his scheduled release date was in 2014, but he hoped for an early release date of May 2012 based on credit for good time.

When respondent-mother took the stand, she did not testify in her own defense and apparently made no effort to contest the termination of her parental rights. Rather, she attempted to provide testimony favorable to respondent-father, declaring that, despite his incarceration, he had never hit her and that she was the aggressor in the events that led to his incarceration. When

---

[7] Moments after giving this testimony, respondent-father contradicted himself when he stated, "I've got seven sisters." In addition, he conceded that one of those sisters had left one of her children in the care of her niece due to "a little drinking problem."

the trial justice inquired about the relevance of this testimony to respondent-mother's defense, her counsel replied that the testimony "goes to the father's fitness." From there, the court asked whether respondent-mother's counsel was "presenting evidence on behalf of the father instead of [his] client." Counsel said, "[a]pparently so, Your Honor. This is my instructions from my client when I'm sitting at counsel table." The trial justice refused to permit this testimony, declaring: "Well, then that's not playing here, [counsel]. If you've got something to defend your client with, fine; if you don't, rest."

The respondent-mother next testified that she had been in and out of prison in both Massachusetts and Rhode Island since Amiah's birth.[8] The witness conceded that she has spent "[m]aybe a year" of the last two years in prison, a period, the court noted, that amounted to half of Amiah's life. At the conclusion of counsel's direct examination of respondent-mother, she volunteered that "[e]verybody makes mistakes." When the trial justice asked whether respondent-mother made more than one mistake, she replied, "a lot of mistakes."

The trial justice delivered an oral pronouncement on June 20, 2011, and he issued a written decree on August 4, 2011, terminating the parental rights of both parents. The trial justice found that both parents presented troubling histories involving imprisonment and drugs; he specifically found that respondent-mother was incarcerated for a period in November 2010 and that respondent-father had been sentenced to twelve years with six to serve for felony domestic assault upon respondent-mother. According to the trial justice, at best, respondent-father would be released sometime in 2012. The trial justice also found that Amiah had been in foster care for nearly two years and that she had bonded with her foster family. Although the trial justice took care in pointing to the commendable efforts respondent-father had made by way

---

[8] In fact, at the time of her testimony, she was incarcerated at the Women's Center at the ACI, where she was awaiting trial for first-degree robbery and conspiracy to commit robbery.

- 6 -

of programs and courses, he found that this "great effort on [respondent-father's] part" was "too little and much too late." Ultimately, in terminating respondent-father's parental rights to Amiah, the trial justice found that respondent-father is "more concerned with his [own] wants and needs than he is with the wants and needs of this child." The trial justice concluded that DCYF had proven by clear and convincing evidence the allegations as set forth in the petition and that it was in the child's best interests to terminate respondents' parental rights.

On appeal, respondent-father asserts that the trial justice erred when he found him to be unfit and also erred in terminating his parental rights based on his incarceration and abandonment of Amiah. In addition, respondent-father contends that the trial justice erred in failing to address whether DCYF made reasonable efforts by offering services to encourage and strengthen the parental relationship. Additionally, respondents both argue that the trial justice erred when he precluded respondent-mother from testifying that she made false allegations about respondent-father's assault upon her because that offense was the underlying charge for which respondent-father was incarcerated at the time of Amiah's birth. The parents contend that this testimony was both relevant and admissible concerning respondent-father's parental fitness and in determining Amiah's best interests.

**Standard of Review**

"On appeal, '[t]his Court reviews termination of parental rights rulings by examining the record to establish whether the [Family Court] justice's findings are supported by legal and competent evidence.'" In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008) (quoting In re Ariel N., 892 A.2d 80, 83 (R.I. 2006)). "These findings are entitled to great weight, and this Court will not disturb them unless they 'are clearly wrong or the trial justice overlooked or misconceived material evidence.'" Id. (quoting In re Destiny D., 922 A.2d 168, 172 (R.I. 2007)).

"Natural parents have a fundamental liberty interest in the 'care, custody, and

management' of their children." In re Destiny D., 922 A.2d at 172 (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). Before terminating a parent's rights to his or her child, the trial justice must find that the parent is unfit. In re Pricillion R., 971 A.2d 599, 604 (R.I. 2009) (citing In re Destiny D., 922 A.2d at 172). In these cases, the right to due process requires that the state support its allegations by clear and convincing evidence. In re Jazlyn P., 31 A.3d 1273, 1279 (R.I. 2011); In re Victoria L., 950 A.2d at 1174 (citing In re Destiny D., 922 A.2d at 172). However, once the trial justice determines parental unfitness, "the best interests of the child outweigh all other considerations." In re Jazlyn P., 31 A.3d at 1279 (quoting In re Destiny L., 21 A.3d 279, 283 (R.I. 2011)).

## Analysis

### Termination of Respondent-Mother's Parental Rights

The issues raised by respondent-mother, although bewildering concerning her right to parent Amiah, wholly lack merit.[9] The sole argument respondent-mother presents on appeal is that her due process right to be "meaningfully heard" was denied because she was prevented from presenting evidence with respect to respondent-father's parental unfitness. She does not contest the trial justice's finding—which we endorse—that she is unfit to parent this child. Rather, respondent-mother makes the unconvincing argument that it was error to deny her the right to present evidence about respondent-father's purported innocence of the incarcerating felony crime.

To support her argument, respondent-mother directs the Court to In re Christina M., 908 A.2d 1073, 1078-79 (Conn. 2006), a Connecticut Supreme Court case that considered whether parents subject to the termination of their parental rights have standing to assert a claim that their

---

[9] We are hard-pressed to discern what standing respondent-mother has to proffer a defense of respondent-father during her case-in-chief. We agree with the trial justice's ruling to the effect that "that's not playing here."

child has a constitutional right to conflict-free legal representation. The respondent-mother contends that the trial justice's decision to preclude her statement about respondent-father's fitness as a parent similarly encroached upon her right to retain her status as a mother. We deem this argument unavailing and irrelevant to the issues before us.

The respondent-mother's argument that she has standing to present evidence about respondent-father's fitness clearly does not have an impact on her own rights as a parent. Although this Court has held that a parent must be given an opportunity to present evidence of his or her parental fitness, In re Victoria L., 950 A.2d at 1175, respondent-mother is not contesting the termination of her own parental rights in this appeal. Therefore, the reliance on the analysis of the Connecticut Supreme Court in In re Christina M. is misplaced and unpersuasive.

We are of the opinion that the trial justice did not err in excluding respondent-mother's testimony that she was the aggressor in the criminal case for which respondent-father was jailed. "This Court has stated that '[t]he admissibility of evidence is within the sound discretion of the trial justice * * *.'" State v. Rodriguez, 996 A.2d 145, 150 (R.I. 2010) (quoting State v. Gautier, 950 A.2d 400, 411 (R.I. 2008)). "This Court will not interfere with the trial justice's evidentiary decision unless a clear abuse of discretion is apparent," id., and we can discern no such abuse. The respondent-mother's allegation that the trial justice erred in limiting her efforts to defend respondent-father is unavailing.

**Termination of Respondent-Father's Parental Rights**

As the trial justice noted, respondent-father presents a different situation. The facts underlying the termination of respondent-father's parental rights give rise to a more challenging analysis relative to the question of parental rights and parental unfitness and a more complex analysis of the grounds upon which the termination of parental rights is warranted in this case.

We acknowledge at the outset that this is a much closer case.

The trial justice declared that respondent-father "is unfit by reason of conduct or conditions seriously detrimental for the child" and "his incarceration * * * is of such a duration to render it improbable for him to care for the child for an extended period of time." The respondent-father urges this Court to conclude that the trial justice erred when he found respondent-father to be unfit. The respondent-father also contends that the termination of his parental rights based on his incarceration and abandonment of Amiah was in error.

We note that respondent-father additionally argues that the trial justice erred in making no finding as to DCYF's reasonable efforts to provide services to encourage and strengthen the parental relationship. We need not address this argument. The Family Court decree indicates that "the [c]ourt finds by clear and convincing evidence that [DCYF] has proven the allegations as set forth in the petition[;]" the allegation to which the decree refers is the allegation that "parents were offered or received services to correct the situation." We have determined that these "services" may be offered by the agency or received elsewhere, and the record clearly reflects that respondent-father participated in a variety of programs and services at the ACI. See In re Raymond C., 864 A.2d 629, 634 (R.I. 2005) (noting that "[§ 15-7-7] does not require that DCYF be the sole provider of services to the parents").

In our opinion, based on the facts in evidence, the trial justice was not clearly wrong in finding respondent-father to be unfit under § 15-7-7(a)(2)(i). Although the fact of the incarceration of a parent is not a sufficient ground to terminate one's parental rights, we have held that "the extended length of a parent's incarceration is, pursuant to § 15-7-7(a)(2)(i), in and of itself, grounds to terminate parental rights." In re Alvia K., 909 A.2d 498, 503 (R.I. 2006). Indeed, when incarceration "is combined with other factors, such as the probable duration of incarceration, there may be sufficient grounds to support a finding of unfitness." In re Jose Luis

R.H., 968 A.2d 875, 885 (R.I. 2009) (citing In re Amber P., 877 A.2d 608, 615-16 (R.I. 2005)). Furthermore, in considering the length of a parent's incarceration, "'the trial justice is not required to consider parole eligibility[;] he or she is only required to consider the probable duration of imprisonment at the time of the termination.'" In re Alvia K., 909 A.2d at 503 (quoting In re Isabella C., 852 A.2d 550, 558 (R.I. 2004)); see also In re Amber P., 877 A.2d at 616. "In calculating the period of incarceration, the [trial] justice may look to the total sentence, even if the parent is eligible for parole." In re Faith H., 813 A.2d 55, 57 (R.I. 2003).

The record clearly reflects that the trial justice did not base his determination solely on respondent-father's incarceration. Instead, the trial justice acknowledged respondent-father's "great effort" to better himself—noting the classes he had taken as well as his dedication to religion and the study of the Bible—in tandem with respondent-father's faithful allegiance to biweekly visits with the child. However, in addition to weighing those factors, the trial justice considered the duration of respondent-father's full sentence of twelve years at the ACI with six years to serve and six years suspended. Amiah was born in June 2009, and this case was decided in June 2011. The trial justice observed that respondent-father already had been incarcerated for twelve of his fifty years. Further, the trial justice noted that, if respondent-father served the full sentence, his release would be in 2014, and the earliest possible release date—based on good time—would not occur until sometime in 2012.

Moreover, the trial justice recognized that Amiah has lived in foster care since birth and that the child had bonded with her foster mother. Recognizing what he termed respondent-father's "great plans," the trial justice doubted whether those plans would come to fruition. The trial justice opined that, unfortunately, respondent-father was "more concerned with his [own] wants and needs than he is with the wants and needs of this child." In the end, respondent-father's efforts were deemed "too little and much too late."

- 11 -

We decline to declare this conclusion clearly erroneous.  At the time of the Family Court's decision in June 2011, there was no reliable indication that respondent-father would be released before his "flat time release" date of 2014, when Amiah would be nearly five years old.[10]  She would be deprived of the benefit of stability and permanency for a significant portion of her childhood.  In light of respondent-father's prison sentence, Amiah's age and development, and the uncertain and vague plans for the child pending respondent-father's release, the trial justice appropriately based his decision on the clear and convincing evidence that respondent-father's "imprisonment rendered it improbable for him to care for the child for an extended period of time."  In re Jose Luis R.H., 968 A.2d at 885.

This Court acknowledges that respondent-father made commendable efforts and expressed sincere love and affection for Amiah and has a desire to be a parent to the child.  Nonetheless, he presented no evidence of his actual ability to care for Amiah within a reasonable period.  Ultimately, "a parent's genuine love for [his] child, or an existence of a bond between parent and child, is not sufficient to overcome the child's fundamental right to a safe and nurturing environment."  In re Douglas F., 840 A.2d 1087, 1089 (R.I. 2003); see also In re Brianna D., 798 A.2d 413, 415 (R.I. 2002).

The termination of parental rights is a sad event.  In re David L., 877 A.2d 667, 673 (R.I. 2005).  Although we note respondent-father's attempts to improve himself and make plans for his daughter, "once unfitness is established, the primary focus no longer is on the parent, but on the child's best interests."  In re Shawn M., 898 A.2d 102, 108 (R.I. 2006).  Indeed, "[t]he best interests and welfare of the child outweigh all other considerations."  Id. (citing In re Kristen B.,

---

[10] We note that respondent-father had been released from the ACI by the time of the hearing of this appeal; but "we review the findings of the trial justice in light of the facts that existed at the time that the Family Court rendered its decision."  In re Jose Luis R.H., 968 A.2d 875, 885 n.9 (R.I. 2009) (citing In re Tinisha P., 697 A.2d 622, 625 (R.I. 1997)).

558 A.2d 200, 203 (R.I. 1989)).  Every child has a right to reasonable care and maintenance; to be free from abuse or neglect, with the hope of spending the remainder of his or her childhood in a family setting in which the child may grow and thrive.  In re Raymond C., 864 A.2d at 634. "Children 'are entitled to permanency; they should not have to wait for an indeterminate period of time to find out if their parents will successfully obtain and maintain a substance free lifestyle.'"  In re Shawn M., 898 A.2d at 108 (quoting In re Eric K., 756 A.2d 769, 772-73 (R.I. 2000)).

Having upheld the trial justice's termination of the respondent-father's parental rights under § 15-7-7(a)(2)(i), we need not address the issue of termination based on abandonment.

**Conclusion**

There is ample evidence to support the trial justice's finding that DCYF proved by clear and convincing evidence that the respondents are unfit parents and that the termination of their parental rights was in Amiah's best interests.  The decree of the Family Court terminating the parental rights of the respondent-mother is affirmed.  As to the respondent-father, the writ is quashed and the papers are remanded to the Family Court with our decision endorsed thereon.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  In re Amiah P.

**CASE NO:**  No. 2011-342-Appeal.
No. 2012-22-M.P.
(07-4022-2)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  October 25, 2012

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**  Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**  Providence County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice John A. Mutter

**ATTORNEYS ON APPEAL:**

For DCYF:  Karen A. Clark
Department of Children, Youth & Families

For CASA:  Shella R. Katz
Court Appointed Special Advocate

For Respondent-Father:
Janice M. Weisfeld
Office of the Public Defender

For Respondent-Mother:
Raymond J. Rigat, Esq.