May 17, 2019

**Supreme Court**

No. 2017-428-Appeal.
(08-520-1)

In re Joziah B.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Joziah B.                          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**   The respondent, Heather B., appeals from a decree entered in the Family Court that terminated her parental rights with respect to her son, Joziah B., who was born on March 1, 2008.[1]  This case came before the Supreme Court on February 27, 2019, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided.  After reviewing the parties' memoranda, we are satisfied that cause has not been shown, and we proceed to decide the appeal at this time without further briefing or argument.  For the reasons set forth in this opinion, we vacate the decree of the Family Court.

---

[1] In the same petition filed against the respondent, the Rhode Island Department of Children, Youth, and Families also sought to terminate the parental rights of Joziah's father.  His case is not before us.

# I

## Facts and Travel

On April 30, 2015, over four years ago, the Rhode Island Department of Children, Youth, and Families (DCYF) filed a petition in Family Court, pursuant to G.L. 1956 § 15-7-7,[2] to terminate respondent's parental rights with respect to Joziah.[3] The petition listed respondent's address as "unknown." In its petition, DCYF alleged that Joziah had been placed in the legal custody or care of the agency for at least twelve months. The petition further alleged that respondent had been "offered or received services to correct the situation which led to the child being placed," and that, because of Joziah's age and his need for a permanent home, there was not a substantial probability that the young boy would be able to return safely to respondent's care within a reasonable period of time. On September 5, 2017, the petition was amended to include an allegation that respondent had abandoned Joziah.

To support its petition, DCYF filed a summary of facts in which it alleged that, on September 11, 2013, the department's child abuse neglect hotline had received a telephone call reporting that Joziah had been left with his maternal aunt with neither clothes nor money to

---

[2] General Laws 1956 § 15-7-7(a) provides, in pertinent part:

> "The court shall, upon a petition duly filed by a governmental child placement agency * * * after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:
>
> "* * *
>
> "(4) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion."

[3] The record reflects that respondent has another child; only Joziah is the subject of this appeal.

provide for his care. The DCYF further alleged that respondent was homeless, was using, presumedly, illegal drugs, and that Joziah had been present at a time that his mother was actively engaging in acts of prostitution. Additionally, according to the summary of facts filed by the department, respondent's family was very concerned because respondent "was sending her pimp to pick up [Joziah]." After a departmental investigation, Joziah was placed in a nonrelative foster home because of respondent's neglect.[4] The summary of facts also asserted that numerous case plans had been provided for respondent and Joziah to address DCYF's concerns, but that respondent had failed to complete her treatment and had not adequately cooperated with DCYF. For instance, it was alleged that respondent had been discharged from a family visitation program as a result of her "ongoing use of heroin, cocaine, 'other opiates,' alcohol and marijuana," and that she had been diagnosed with "Opioid type dependence, episodic use, Major Depressive Disorder, recurrent episode, moderate degree, Cannabis Dependence, mood Disorder, NOS and PTSD." The caseworker who drafted the summary of facts also represented that the last contact she had had with respondent occurred on March 23, 2015, and that the last time respondent had contact with Joziah was during a supervised visit that took place on February 27, 2015.[5]

The summary of facts also revealed that Joziah had endured trauma throughout his life, including being sexually abused by babysitters, witnessing domestic violence, his mother

---

[4] The summary of facts also recounted that DCYF previously had accused respondent of neglect at the time of Joziah's birth because both respondent and the infant Joziah had tested positive for marijuana.

[5] As further discussed *infra*, at the hearing on the petition to terminate respondent's parental rights, the DCYF caseworker provided the court with an update on respondent's contact with Joziah, and represented that the last contact that respondent had had with Joziah "was around the time she signed off on direct consent adoption to the foster parent[,]" which occurred in November 2015. The trial justice found at that hearing that respondent's last contact with Joziah was "shortly after November of 2015."

performing acts of prostitution, and even being kidnapped for ransom by respondent's pimp. According to DCYF, at the time of the filing of the petition for termination of parental rights, Joziah was in his fourth nonrelative foster home, had "engaged in incidents of inappropriate sexualized behavior with other foster children and his sister and struggles with symptoms of Post Traumatic Stress Disorder, anxiety and Attention Deficit hyper Activity Disorder."

In May 2015, an arraignment was held in Family Court, and respondent was referred to the public defender's office; a public defender entered his appearance on respondent's behalf later that month. Although a trial was planned, respondent consented to Joziah being adopted in November 2015. Later that month, however, respondent filed an emergency motion to withdraw her consent for the adoption. That motion was scheduled to be heard on January 5, 2016; however, the record reflects that respondent failed to appear at that hearing and the motion was passed. On that same day, the public defender who had been representing respondent was permitted to withdraw from the case.

Over a year and a half later, in September 2017, the Family Court ordered that an advertisement be placed in a local newspaper, notifying respondent that a hearing on the petition to terminate her parental rights would be held on October 3, 2017. That advertisement was placed in *The Providence Journal* on September 22, 2017, and provided that respondent's parental rights would be terminated if she failed to appear.

The respondent was not present at the October 3, 2017 hearing. The court went forward with the hearing, despite respondent's absence, and received testimony from Denise Zolnierz, the DCYF casework supervisor for Joziah's case. Ms. Zolnierz testified that, on September 11, 2013, more than four years earlier, DCYF had received a call that respondent had left Joziah with her sister so that respondent could be available to engage in prostitution in Connecticut, and that

her sister was concerned for the welfare of the child. Ms. Zolnierz testified that DCYF developed case plans for respondent that included mental health counseling, substance abuse treatment, nonoffending parenting, and visitation. According to Ms. Zolnierz, the department made referrals for respondent to accomplish the goals of those case plans, but, besides participating in some of the trauma treatment for Joziah, respondent failed to complete her substance abuse and mental health treatments. Ms. Zolnierz further testified that she did not know where respondent was, that she believed respondent had not visited with Joziah for the past year, and that she thought respondent's last contact with Joziah "was around the time she signed off on direct consent adoption to the foster parent." She also believed that respondent had a criminal history and "ha[d] been in and out of the [Adult Correctional Institutions] for various crimes." Ms. Zolnierz testified that, shortly after respondent consented to Joziah being adopted, the child was hospitalized for mental health and trauma care, and that his foster mother "could not adopt him based on his behaviors." According to Ms. Zolnierz, at the time of the October 3, 2017 hearing, Joziah was not living in a new preadoptive home and had instead been living in residential care because of his mental health needs. She informed the court that Joziah at that point was "very stable" and was "doing the best he's done in a long time[,]" and that DCYF was actively seeking a preadoptive home for him.

The trial justice then made findings of fact, by clear and convincing evidence, based on the uncontradicted testimony of Ms. Zolnierz and the DCYF summary of facts that had been marked as a full exhibit. The trial justice found as a fact that the case opened to DCYF in September 2013, and noted the allegation that respondent had left Joziah with her sister, who was the foster mother at some point, so that she could engage in prostitution in Connecticut. The trial justice further mentioned the allegation that respondent had not returned for Joziah for a

period of three months, and also found that Joziah had been removed from his mother's care. She found that DCYF attempted to assist respondent with multiple case plans and that numerous referrals had been made, but found that respondent "did not comply with any of the referrals or the case plan." She found that the last time respondent had been in contact with Joziah "was shortly after November of 2015[,]" that the child had been hospitalized, was being treated for trauma, and was, at the time of the hearing on the petition for termination of parental rights, living in residential care, where he had been for over six months. The trial justice further said that Joziah was registered with Adoption Rhode Island and appeared to be stable, but that he had "some serious mental health needs and trauma treatment." For these reasons, the trial justice determined that respondent had abandoned Joziah as a result of her failure to have contact with him for over six months, that DCYF had attempted to work with respondent for a substantial period of time, and that it was unlikely that Joziah could be returned to his mother's care within a reasonable period of time, "considering the child's age and the child's need for a permanent home." The trial justice also found that it was in the best interest of the child to be adopted and that respondent did not cooperate with DCYF services to strive toward reunification. For all of those reasons, the trial justice determined that respondent was unfit to parent; she ordered that respondent's parental rights be terminated and that DCYF, as the guardian of the child "for all purposes[,]" would have "the exclusive right to place [Joziah] for adoption and be the sole party to give or withhold consent." Shortly thereafter, a decree mirroring the trial justice's findings was entered. The respondent timely appealed the decree.

**Standard of Review**

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Malachii O.*, 152 A.3d 1153, 1157 (R.I. 2017) (quoting *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012)). As a result, the findings of a trial justice in a proceeding concerning the termination of parental rights "must be supported by clear and convincing evidence." *In re Izabella G.*, 196 A.3d 736, 741 (R.I. 2018).

"On appeal from a decree terminating parental rights, 'this Court applies a deferential standard.'" *In re Lauren B.*, 78 A.3d 752, 759 (R.I. 2013) (quoting *In re Julian D.*, 18 A.3d 477, 481 (R.I. 2011)). "[T]his Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Izabella G.*, 196 A.3d at 740 (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451). "These findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* at 740-41 (quoting *In re Amiah P.*, 54 A.3d at 451).

**III**

**Discussion**

On appeal, respondent, while providing the Court with a written update of her condition and status, also contends that she was not "aware of the court date on October 3, 2017 or else I would have been there."[6] In response, Joziah's guardian *ad litem* argues that respondent has

---

[6] We note that respondent also failed to appear before this Court for oral argument. At that time, DCYF represented to this Court that it had tried and failed to contact respondent, that respondent currently is staying in a shelter, and that respondent is actively involved in a domestic violence dispute with the same individual she was living with at the time her appeal was filed and who she

alluded only to the fact that she was not aware of the court date, but she "does not question the sufficiency of notice by publication." The DCYF also argues that the hearing date was appropriately advertised in *The Providence Journal* in advance of the termination of parental rights hearing.[7]

Our examination of the record, however, reveals a fatal flaw in this case which constrains us to vacate the termination decree. Section 15-7-7 sets forth the procedures and findings that are necessary to terminate parental rights. However, specifically relevant to this case is § 15-7-9, which provides the following:

> "(a) When a petition concerning the adoption or termination of parental rights is filed which sets forth that the whereabouts of the parent or parents of the child are unknown, *that fact shall be sworn to by the petitioners by affidavit which shall set forth the last contacts with the absent parent and any other information considered pertinent in determining the absent parent's whereabouts*.

> "(b) *The court shall review the affidavit* and, if it is determined that personal service cannot be effectuated, an order of notice shall be entered directing that notice be given to the parent by publication in any newspaper of general circulation that the court directs; which notice shall be published once and this notice may be combined and placed with other names that the court is attempting to notify." (Emphasis added.)

According to § 15-7-9, because DCYF indicated in its petition and later informed the Family Court that respondent's whereabouts were unknown, DCYF faced a statutory requirement to file an affidavit stating that respondent could not be found and to "set forth the last contacts with the absent parent and any other information considered pertinent in

---

had alleged, in her memorandum to this Court, was "a great support system to [herself]" and would be a "great role model" for Joziah.

[7] We are of the opinion that, by contending that she was not aware of the court date and that, had she been aware of the hearing she would have been present, respondent is challenging the sufficiency of the notice that the hearing date was scheduled for October 3, 2017. We therefore disagree with the guardian *ad litem*'s narrow interpretation of respondent's argument.

determining the absent parent's whereabouts." Section 15-7-9(a).  That affidavit must be filed *in advance of* a Family Court order of notice "by publication in any newspaper of general circulation that the court directs[.]" Section 15-7-9(b).  After scouring the record, it is clear that no such affidavit was filed with the court as required under § 15-7-9, and, therefore, the Family Court's order of advertisement in *The Providence Journal* to alert respondent that her parental rights might be terminated if she failed to appear does not pass statutory muster.  For this reason, notice of the October 3, 2017 hearing date was improper as a matter of law.

We previously have acknowledged that parents have "no absolute right to be physically present at the termination hearing." *In re Ariel N.*, 892 A.2d 80, 84 (R.I. 2006) (quoting *In re Brandon A.*, 769 A.2d 586, 590 (R.I. 2001)).  Nonetheless, "although the termination of parental rights is a civil, not a criminal proceeding, the termination of parental rights is a significant event in which a parent's due process rights reasonably should be protected." *Id.* (brackets and deletion omitted) (quoting *In re Ginger G.*, 775 A.2d 255, 258 (R.I. 2001)).

This Court previously has expressed concern for a natural parent's rights when a parent is absent from a hearing on termination of parental rights.  In *In re Ginger G.*, we vacated a Family Court decree terminating a *pro se* respondent's parental rights where the respondent failed to appear and no attorney, not even the court-appointed guardian *ad litem* who was present at the hearing, represented her interests. *In re Ginger G.*, 775 A.2d at 258.  We held that, "[a]t a minimum, a Family Court justice should inquire about the status or position of the parent and the reason for his or her absence to ascertain whether the non-appearance was voluntary or non-voluntary." *Id.* at 258-59.  We remanded that case for a hearing to give the respondent an opportunity to present evidence and cross-examine witnesses. *Id.* at 259.

Although the facts in this case are slightly different because respondent's whereabouts have been unknown since early in the proceedings, it is nonetheless clear that "the termination of parental rights is a significant event in which a parent's due process rights reasonably should be protected" when the parent fails to appear at the hearing. *In re Ginger G.*, 775 A.2d at 258.  We recognize that this case has been ongoing for several years and that all parties, including and especially Joziah, deserve stability and finality.  However, "[t]his Court has long acknowledged that 'parents are entitled to procedural due process before the termination of their parental rights.'" *In re Ariel N.*, 892 A.2d at 84 (quoting *In re Brandon A.*, 769 A.2d at 590); *see also In re Lauren B.*, 78 A.3d at 759 ("[T]he termination of a parent's rights is a 'grave, drastic, and irreversible action.'") (quoting *In re Gabrielle D.*, 39 A.3d 655, 665 (R.I. 2012)).  Therefore, the decree in this matter must be vacated and the matter remanded to the Family Court for a hearing with appropriate notice in accordance with § 15-7-9.  We direct that respondent be represented by counsel at that hearing.

## IV

## Conclusion

For the foregoing reasons, we vacate the decree of the Family Court and remand to that court for further proceedings consistent with this opinion.

SUPREME COURT – CLERK'S OFFICE

OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Joziah B. |
| **Case Number** | No. 2017-428-Appeal.<br>(08-520-1) |
| **Date Opinion Filed** | May 17, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Laureen A. D'Ambra |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Karen A. Clark<br>Department of Children Youth and Families<br><br>Susan M. Fink, Esq.<br>Guardian Ad Litem<br><br>For Respondent:<br><br>Heather Bessette, Pro Se |