June 17, 2020

In re Adele B.                          :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at (401) 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Adele B.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Goldberg, for the Court.**  This case came before the Supreme Court on appeal by the respondent, Marybeth Boyd (respondent), from a decree terminating her parental rights to her daughter, Adele B., who was born on March 28, 2013.  On appeal, the respondent argues that: (1) the trial justice erred by failing to recuse herself from the trial after she ordered the filing of a petition to terminate the respondent's parental rights; (2) it was erroneous for the trial justice to find, by clear and convincing evidence, that the respondent was an unfit parent; and (3) the trial justice erred by concluding that there was clear and convincing evidence that it was in Adele's best interests to sever the respondent's parental rights to her.  For the reasons stated herein, we affirm the decree of the Family Court.

## Facts and Travel

The relevant facts of this case, established by a lengthy and painful record, spanning two states and the birth of seven children, have been carefully reviewed by this Court.  What is clear is that respondent has a lengthy and significant history of neglecting her children and permitting child abuse, along with substance abuse, mental health issues, and suffering domestic violence from the same violent partner and others.  The respondent's substance abuse and mental health

- 1 -

issues date back to her teenage years; respondent has suffered domestic violence since childhood, by her parents and thereafter by a series of men in her life. As discussed in greater detail *infra*, domestic violence has been, and continues to be, a critical problem with the men in respondent's life, to the danger of her children.

Adele is respondent's seventh child and the only child born in Rhode Island, the result of a deliberate attempt to flee the jurisdiction of the Commonwealth of Massachusetts. The impact that respondent's history of substance abuse, mental health, and domestic violence issues has had on the six older children is tragic. Since 1999, when her first child, followed by five more children, was open to the Massachusetts Department of Children and Families (DCF), respondent's parental rights have been voluntarily or involuntarily terminated as to four out of the six children.

At the time of trial, respondent's oldest child, Lyric, was eighteen years old. Her second child, Giovanni, was thirteen years old. Lyric and Giovanni were born to different fathers, and each was placed with their respective father by court decree; however, respondent's parental rights over these children remained intact. Samuel Clark fathered five children, including Adele. The first child was a daughter, named Autumn. The respondent became pregnant again, but suffered a miscarriage after an episode of domestic violence perpetrated by Clark. The respondent next gave birth to another daughter, named Annaleigha. After a termination of respondent's parental rights, Annaleigha and Autumn were adopted by respondent's sister and a nonrelative, respectively. Two sons, named Hayden and Troy, were born next; they were adopted by nonrelatives after an involuntary termination of respondent's parental rights.[1]

---

[1] Hayden and Troy were in the Massachusetts DCF system since July 5, 2011, when the neglect of both children and the abuse of Troy, specifically, were first reported to DCF. The children were out of respondent's and Clark's care since July 7, 2011, when DCF assumed custody of

- 2 -

Finally, Adele was born in Rhode Island.  The respondent, who was not a Rhode Island resident and had no connections to this state, testified at trial that she had been advised by her attorney to give birth in a state other than Massachusetts because crossing state borders would increase the chances of retaining placement of the child.  The parents were homeless; there was no prenatal care and no provisions to care for the child.  These are the circumstances into which Adele was born on March 28, 2013.

A seventy-two-hour protective hold was issued by hospital staff based on the hospital's concerns surrounding respondent's history, her lack of compliance with prenatal care, and the circumstances of her flight to Rhode Island.  Douglas Klein, a child protective investigator with the Rhode Island Department of Children, Youth, and Families, was called to investigate; he filed an *ex parte* neglect petition in Providence County Family Court on April 1, 2013.  Based on the history of both parents with Massachusetts DCF, Adele was placed in nonrelative foster care.[2]  The respondent subsequently entered the SSTARbirth drug treatment program in August 2013, and began residing at SSTARbirth's facility.  In September 2013, DCYF permitted Adele to be placed with respondent at the SSTARbirth facility.  She was five months old.

---

both children.  On August 11, 2011, respondent was arraigned and charged with two counts of permanent injury to a child, arising out of the abuse to Troy.  The respondent's and Clark's parental rights over the children were terminated on February 15, 2013, by the Dedham Juvenile Court in Massachusetts.  The respondent's trial for permanent injury to a child was anticipated for later in 2013, and it is discussed in greater detail *infra*.

[2] Clark filed a separate appeal from the termination of his parental rights.  A conditional order of dismissal pursuant to Article I, Rule 18A of the Supreme Court Rules of Appellate Procedure was entered by this Court on April 10, 2018, and the case was subsequently closed on May 1, 2018.

In September 2013, after a hearing on the pending petition for neglect, a justice of the Providence County Family Court found that Adele had been neglected by respondent.[3] Despite the finding of neglect, Adele remained with respondent at SSTARbirth. In February 2014, after completing the program at SSTARbirth, respondent and Adele moved to the Amos House Mother-Child Reunification program. This interlude was short-lived.

The respondent and Adele remained at Amos House for six months; in August 2014, when Adele was sixteen months of age, respondent was found guilty and incarcerated in Massachusetts for the criminal offense of permitting injury to her son Troy. Baby Adele was returned to foster care, where she has remained. The Family Court subsequently ordered that, upon respondent's release from prison, DCYF could not place the child with respondent and that visits must be supervised. The respondent had no visits with Adele nor was any direct contact permitted during her incarceration in Massachusetts. She returned to Rhode Island in April 2015. Adele was two years old.

On April 28, 2015, at a permanency hearing, the Family Court justice inquired about DCYF's position regarding a termination of parental rights (TPR) petition.[4] The Family Court

---

[3] Although he is not a party to this case, we note that Clark was also found to have neglected Adele, after proof, in the Family Court on October 1, 2013.

[4] The permanency hearing held was mandated by law. General Laws 1956 § 40-11-12.1(a) provides that:

> "Within a period of twelve (12) months after a child is placed in the care of the department of children, youth, and families pursuant to the provisions of this chapter or § 14-1-5, or §§ 42-72-14 and 14-1-11.1, and the child has resided in foster care or, pursuant to §§ 42-72-14 and 14-1-11.1 * * * the department of children, youth, and families shall file a motion in the family court requesting a permanency hearing on the status of the child."

- 4 -

justice ordered that there be a consultation with DCYF's legal staff and a determination made by May 28, 2015, as to whether a TPR petition would be filed. A second permanency hearing was held on May 28, 2015. The Family Court justice once again inquired as to whether a TPR petition would be forthcoming, and DCYF responded that it was awaiting respondent's records from Massachusetts and was not filing a petition at that time. It was DCYF's position that, without the records from Massachusetts, the crucial element of parental unfitness could not be proven. The Family Court justice ordered the records from Massachusetts to be filed within forty-five days, and a TPR petition was ordered to be filed within sixty days. It is unclear why these records had not been produced earlier. It is abundantly clear that this order was the catalyst for their production. On June 17, 2015, respondent filed a motion seeking the recusal of the Family Court justice; respondent conceded that she sought recusal because the Family Court justice had ordered the TPR petition to be filed.[5]

The TPR petition, which is the subject of this appeal, was filed on July 15, 2015, and alleged:

> "The child has been placed in the legal custody or care of the Department of Children, Youth and Families (DCYF) for at least twelve (12) months; and the mother was offered or received services to correct the situation which led to the child being placed, and provided further that there is not a substantial probability that the child will be able to return safely to the mother's care within a reasonable period of time considering that child's age and the need for a permanent home."[6]

---

At this point Adele was past the age of two years old and had been in DCYF custody for her entire life, including over the past eight months when she was in foster care during respondent's incarceration.

[5] A motion for placement was filed as well, but that motion is not at issue in this appeal.

[6] The TPR petition also alleged: "The father has abandoned or deserted the child."

The motion seeking the recusal of the Family Court justice was set for hearing on July 22, 2015. The child's guardian *ad litem* argued that the standard for recusal had not been met; DCYF deferred to the court on the matter. The Family Court justice denied the motion to recuse, stating that: "Other than the ordering of the filing of the TPR, I have made no other ruling. * * * It will still be up to the Department, as to whether or not they can prove their case."

Trial commenced in October 2015 and concluded in November 2015. The first witness to testify was Douglas Klein, the DCYF child protective investigator called to investigate after Adele was born. According to Klein, based on the circumstances of Adele's birth in Rhode Island and the fact that the parents had a significant history of child abuse in Massachusetts, DCYF became involved. Mr. Klein testified that his investigation revealed a history that set forth "multiple prior terminations of parental rights against both the mother and the father, * * * a history of severe domestic violence between the parents, substance abuse issues, and chronic neglect of their children." He also learned that Clark "may have caused the mother to miscarry one of her pregnancies."

According to Klein, respondent confirmed that she did not have custody of any of her children, and that she and Clark were still in a relationship. The respondent and Clark were homeless; they had no provisions to care for a newborn, no diapers, clothes, or formula. When Klein attempted to discuss the domestic violence issues, respondent became evasive and downplayed Clark's violence. According to Klein, Clark attempted to enter the hospital room during the interview, but was prevented from doing so by hospital security, based on his history of domestic violence. Clark became aggravated and aggressive toward Klein and a physician, and he was escorted from the building. The case was indicated for neglect as to both parents on

- 6 -

several grounds, including their history in Massachusetts, the fact that Adele was born in Rhode Island while the parents had no means to care for the child, and ongoing domestic violence.

The respondent testified next. She acknowledged that, although she was living in Fall River, Massachusetts, before Adele's birth, she was advised to deliver the child in a state other than Massachusetts, which is how she came to be located in Pawtucket, Rhode Island, where Adele was born. The respondent testified that Adele was born on March 28, 2013, and testified that she had been accepted into the SSTARbirth program on August 7, 2013, which was also her "sobriety date"—the last time that she used drugs—over four months after Adele was born.[7]

According to respondent, at SSTARbirth she was required to participate in various programs, services, and drug screens, including counseling, parenting classes, and the Family Treatment Drug Court. After thirty days in the program, respondent obtained placement of Adele, and she and the child remained at SSTARbirth for six months and completed the program. In February 2014, respondent and Adele entered the Amos House Mother-Child Reunification program. Throughout this period, however, criminal charges for permitting injury to her son were pending in Massachusetts. The circumstances surrounding the resolution of this criminal case contributed to respondent's undoing.

In August 2014, a four-day criminal trial was held in Quincy, Massachusetts; respondent testified that she brought Adele with her on the first day of trial and engaged in a prohibited encounter with Clark, who was photographed with Adele in his arms. The respondent was convicted of the charges and served seven months in prison in Framingham, Massachusetts.

_____

[7] The respondent testified that she was staying at The Mission, a shelter in Providence, between Adele's birth and her acceptance into SSTARbirth. She also testified that she was staying at The Mission again at the time of trial.

- 7 -

Adele was removed from her care on the date of her conviction and, since August 20, 2014, nearly six years ago, respondent has not been permitted to care for the child.

The respondent was released from prison on March 17, 2015, and returned to Rhode Island in April 2015; she initially returned to Amos House and was limited to weekly, supervised visits with Adele. When the TPR petition at issue in this case was filed in July 2015, she was no longer eligible to remain in the Amos House program.[8]

The respondent testified about her history with Clark and their current relationship. She admitted that physical violence arose when they "were using[,]" and that Clark beat her on multiple occasions. In 2004, when she was pregnant, she was hit by Clark and suffered a miscarriage. Despite this incident of violence and her miscarriage, respondent remained with Clark and gave birth to four more children.

The respondent was confronted with a number of alarming photographs and videos from her social media accounts, most of which had been posted in the days and weeks leading up to this trial, including just three days before trial. Included in the postings was a video of respondent and Clark kissing, along with several photographs of the couple posing together in various settings. The respondent admitted that these photographs and videos were posted in an album she entitled "Miracles Happen Everyday." The respondent was less than truthful when asked whether she had posted a video of her kissing Clark during the previous week.[9]

The respondent identified a photograph she took on the first day of her criminal trial in Massachusetts, which depicted Clark outside of the courthouse holding Adele. Despite being

---

[8] The respondent testified that she saw Adele on April 13, 2015, during a supervised visit. At that point, respondent's visits were limited to weekly, supervised visits with Adele. Once the TPR petition at issue in this case was filed, the visits remained supervised, but were biweekly.

[9] When asked why she still maintains the photographs given that she purportedly was afraid of Clark, she testified that she is "[o]ne of those people that keep everything, good and bad."

warned that any contact by Clark with Adele had to be supervised by DCYF, respondent nonetheless permitted Clark to hold Adele and pose for a photograph, which respondent posted on social media. When asked whether she knew that Clark would be at the courthouse that day, she conceded that, despite knowing Clark was on the witness list, she brought Adele to the courthouse.

The respondent acknowledged that, although she avoids Clark, should he speak to her on occasion, "I won't be mean and snub him, but I'll just say, hi, or whatever."[10] In fact, she admitted that they were in contact as recently as the previous day, the first day of trial in the present case, in the courthouse. Although she was unsure how Clark knew to come to the courthouse that day, he tried to convince her that she would not succeed at the TPR trial, and he declared: "I don't know why you even bother to try; you'll never get her." Significantly, in another social media post, three days before trial, respondent declared that she and Clark:

> "[A]re best friends forever and that will never change! * * * I've built a wall around myself and sometimes Sam climbs that wall and I sometimes let him stay for awhile due to the love we share! *Other than that I know we are sole mates that have lost our way to each other*." (Emphasis added.)

The respondent's justification for these social media posts of photos, videos, and glowing statements about Clark, including that he was her "best friend" and soulmate was that: "He probably is going to be the only person I would ever consider a best friend[,]" and that, "it's sad to me because I still love him as a person."

---

[10] It is of note that respondent's case plans included having no contact with Clark and provided that, if Clark contacted respondent, she was to notify the police. The record is replete with instances of Clark contacting respondent, but is devoid of any indication that she ever notified police of the numerous contacts. As discussed *infra*, details of respondent's encounters with Clark, including an entire hours-long encounter a month before trial, were kept from various service providers across her several treatment channels.

Finally, several days into the trial and after she had begun testifying, respondent disclosed that she and Clark had been in contact in September 2015—a month before trial—at a bereavement for her brother-in-law in Massachusetts. It was her understanding that Clark learned of the bereavement through her nephew Ronnie, and that she, Clark, and Ronnie enjoyed a three-hour lunch and reunion. The respondent testified that she made this untimely disclosure in an effort to be honest about her situation, but she failed to disclose the contact to any service provider or contact the police, as required by her case plan.

Rebecca Carter, a licensed mental health counselor in Rhode Island, testified that she had completed a parent-child evaluation of respondent and Adele in 2013 while respondent was residing at SSTARbirth. Ms. Carter testified that respondent's history, including the nature of her relationship with Clark, raised concerns about her protective capacity and the child's safety. In order for Adele to remain with respondent, Carter recommended, among other things, that respondent "establish and maintain appropriate and stable housing[,]" that respondent "effectively demonstrate her understanding of protective capacity and not expose her child to unsafe people or situations[,]" and that respondent "follow all DCYF expectations regarding contact between Adele and Mr. Clark." Ms. Carter testified that, if respondent failed to follow these recommendations, DCYF should pursue alternative permanency planning. Ms. Carter also testified that, in her opinion, bringing one's daughter to a criminal proceeding in which one was on trial for permitting injury to another child was not a safe environment as set forth in her recommendations and demonstrated a significantly impaired protective capacity. She also expressed grave concerns about the posted video of respondent kissing Clark and expressed that, if she was made aware of the recent social media posts in which respondent referred to Clark as her soulmate and "best friend," her concern would be heightened based on a relationship by

respondent with Clark, "however defined," which would, in turn, raise questions about respondent's capacity to protect Adele.

Heather Curley, a DCYF social worker assigned to work on Adele's case, testified that she had a conversation with respondent on or about September 29, 2015, after a supervised visit, during which respondent stated that "if she lost the trial she would give up and she'd just go back to doing what she did before." When Curley asked her to clarify that remark, respondent became more emotional and declared that she "would use again and she hated Rhode Island and would go back to Massachusetts and just give up[.]"

Laura McKiernan, the social caseworker assigned to Adele's case since September 2013, was the next witness to testify. Ms. McKiernan testified that she had oversight of the case and was familiar with the four case plans that were developed by DCYF. She also described the various services that were offered and provided to respondent, including extensive substance abuse services, individual and group mental health counseling, substance abuse treatment, "tox screens," and domestic violence groups. She testified that respondent continued to make progress on the case plans and that her drug screens were clean.

Melissa Dewey, a family center specialist at Child and Family, testified that respondent and Adele were referred to her in April 2015 and were discharged in June 2015, after the TPR petition at issue was filed. The respondent participated in the program, but goals for phase one (out of four possible phases) were never formulated because of respondent's discharge from the program.

Alan Whelan was the next witness to testify. He testified that he was respondent's case manager at Project Connect, beginning in June 2014 until August 2014, when she was imprisoned in Massachusetts, and again starting on April 28, 2015, after she was released. He

testified to meeting with respondent once or twice a week, and he considered her to be cooperative; she was consistent, punctual, and not withholding what she was feeling. However, he testified that he did not know about the specific modality of her various treatments for substance abuse in Massachusetts, nor the full history of substance abuse in Massachusetts. Mr. Whelan also testified that, while respondent told him that her relationship with Clark was over, she did not discuss him much and she minimized Clark's history of domestic violence toward her.

Rosemary Soave, the coordinator of the Rhode Island Family Treatment Drug Court, was called to testify next. Ms. Soave testified that she met with respondent at SSTARbirth in 2013 for intake and assessment, and to discuss respondent's eligibility for the Drug Court. Ms. Soave testified that during respondent's time with the Drug Court, all of her weekly drug screens were negative, but that respondent never successfully completed the program because she was discharged when she went to prison.

Carolanne McNichols, a child support technician with DCYF, testified that she supervised visitation between respondent and Adele at various points between 2013 and 2015, and that her responsibilities included transporting Adele for visits and supervising the visits, including assessing the risk and safety and making appropriate suggestions for improvement. Ms. McNichols testified that in 2015, when she picked up Adele at her foster home, Adele appeared very well; she was clean and nicely dressed. However, Adele was a little apprehensive upon seeing her, and it did not appear that she wanted to go with her. Ms. McNichols also testified that on the next visit, on June 3, 2015, Adele began crying when she was picked up for the visit. From that point forward, her foster mother would bring Adele to the vehicle and fasten her into the car seat.

Nora Henley, a social caseworker for DCYF, testified next, and stated that she was assigned to respondent's case on October 18, 2013. Ms. Henley testified that she was tasked with formulating case plans for respondent, and that a significant part of every plan was that respondent was to develop a protective capacity as to Clark. While Henley acknowledged that respondent had been cooperative with the services that had been offered to her, she also testified that had she known that respondent and Clark had contact, based on the history of extreme violence and that the couple's children were sometimes thrust into that violence, her opinion that respondent cooperated with the services offered by DCYF would change. Ms. Henley also testified that, because domestic violence was a major issue between the couple, if respondent admitted she was in Clark's company as recently as six weeks before trial, respondent's protective capacity would be questionable. Regarding the various photographs of respondent and Clark admitted into evidence, Henley testified that if she had been aware of the photographs, it would have affected how she handled the case; Henley flatly declared that reunification with Adele "would have been impacted by her relationship with [Clark]. It clearly, by the posts, looks like she's resumed her relationship with [Clark]." As to the photograph of Clark holding Adele outside of the courthouse in Quincy, Massachusetts, Henley testified that respondent had permission to bring Adele to court, but that she was never informed of respondent's interaction with Clark, nor that a photograph existed of Clark posing with Adele in his arms.

Finally, Susan Dounetos, a former program coordinator in the Amos House Mother-Child Reunification program, testified that she worked with respondent when she transferred from SSTARbirth to Amos House in February 2014. Ms. Dounetos testified that respondent represented that she had been clean for six months and had completed the SSTARbirth program, and that she faced a pending criminal charge and upcoming court date in Massachusetts.

Ms. Dounetos testified that she did not know the specifics of the criminal case at the time of the intake meeting, nor that respondent was charged with permitting injury to one of her own children. Ms. Dounetos further testified that, although respondent's drug and alcohol screens were negative, her attendance at AA and NA meetings was "somewhat sporadic."

Ms. Dounetos also testified about numerous deficiencies that she observed in respondent's parenting ability during her stay at Amos House, including respondent's failure to keep her room clean and difficulty maintaining Adele's cleanliness. For example, Dounetos testified that, after playing outside, Adele would return to the house filthy; although respondent was expected to bathe Adele when she first came back inside, she would socialize with other mothers instead and would not bathe Adele until later. Additionally, respondent missed several mandated mental health programs at Gateway and was in jeopardy of being discharged from that program if she missed any more. One reason given for missing the appointments was that respondent "just forgot" about them.

With respect to respondent's relationship with Clark, Dounetos testified that respondent told Dounetos that she had seen Clark at the courthouse and "that it went okay[,]" but Dounetos did not recall her saying anything about a photograph of Clark and Adele. Lastly, Dounetos testified that, because respondent did not actively seek employment until she came back to Amos House after prison, she was not cooperating with that aspect of her case plan.

On December 9, 2015, the Family Court justice issued a comprehensive written decision, spanning sixty-three pages, and concluded that respondent was unfit and that the TPR petition should be granted. After an in-depth review of the testimony and relevant trial exhibits, the Family Court justice made thirty-seven separate findings of fact. She found by clear and convincing evidence that respondent was unfit to parent Adele and that termination of

respondent's parental rights was in the best interest of Adele. In arriving at her decision, the Family Court justice highlighted respondent's significant history with Clark and her ongoing contact with him, as well as respondent's apparent unwillingness to accept responsibility for the injuries suffered by her son, Troy. Significantly, the Family Court justice noted the high number of service providers who "were involved with [respondent], and yet not one of them had the whole and complete picture of [respondent]." It was the Family Court justice's belief that "mother made a calculated decision to keep certain information off the radar in order to keep her in the good graces of the programs and providers."

A decree terminating respondent's parental rights to Adele entered on December 16, 2015. The respondent filed a timely notice of appeal on December 24, 2015. This appeal was heard on October 2, 2019—almost four years later.

## Standard of Review

"It is well established that judicial officers are obligated to recuse themselves if they are 'unable to render a fair or an impartial decision in a particular case.'" *State v. Mlyniec*, 15 A.3d 983, 998-99 (R.I. 2011) (quoting *Kelly v. Rhode Island Public Transit Authority*, 740 A.2d 1243, 1246 (R.I. 1999)). "At the same time, however, justices also have an equally great obligation *not* to disqualify themselves when there is no sound reason to do so." *Id.* at 999 (quoting *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 185 (R.I. 2008)). "The burden is on the party seeking recusal to set forth facts establishing that the justice possesses a 'personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his or her impartiality seriously and to sway his or her judgment.'" *Id.* (brackets omitted) (quoting *Mattatall v. State*, 947 A.2d 896, 902 (R.I. 2008)).

- 15 -

This Court consistently has recognized that "[n]atural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019) (quoting *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012)). "Before terminating a parent's rights to his or her child, the Family Court justice must find that the parent is unfit." *Id.* (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451). Therefore, "due process requires that a Family Court trial justice find, by clear and convincing evidence, that a parent is unfit before terminating his or her rights to a child." *In re Steven D.*, 93 A.3d 978, 984 (R.I. 2014) (deletion omitted) (quoting *In re Lauren B.*, 78 A.3d 752, 759 (R.I. 2013)). "However, once the Family Court justice determines parental unfitness, the best interests of the child outweigh all other considerations." *In re Violet G.*, 212 A.3d at 166 (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451).

Our task is to examine the record to determine "whether the Family Court justice's findings are supported by legal and competent evidence." *In re Amiah P.*, 54 A.3d at 451 (brackets omitted) (quoting *In re Victoria L.*, 950 A.2d 1168, 1174 (R.I. 2008)). "These findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Victoria L.*, 950 A.2d at 1174). "Conducting this review requires [this Court] to engage in a three-step process in which we (1) review the trial justice's finding of parental unfitness; (2) consider whether reasonable efforts at reunification were made by DCYF; and (3) evaluate the finding that termination of parental rights is, in fact, in the best interest of the child." *In re Steven D.*, 93 A.3d at 984.

- 16 -

## Analysis

## Motion to Recuse

We begin by addressing respondent's appeal from the trial justice's refusal to recuse in this case. The respondent argues that the trial justice erred in failing to recuse herself because, according to respondent, the trial justice had created the appearance of prejudging the merits of this case by ordering DCYF to file the TPR petition at issue in this case, over DCYF's objection. The respondent also argues that the trial justice displayed bias against respondent throughout trial, contending that she had somehow prejudged the merits of the case. After a careful review of the record, we disagree with this argument and reject respondent's selective citations to the trial transcript.

Here, the trial justice ordered DCYF to file the TPR petition at issue after Adele had been in the custody of DCYF for over two years, and DCYF had not established permanency for Adele. Indeed, DCYF had yet to obtain the records from the Commonwealth of Massachusetts, and this order was the catalyst for procuring those damning records. The respondent heavily relies on statements made by DCYF at the May 28, 2015 hearing, including its assertion that DCYF had decided that it could not currently prove unfitness. This reliance is misplaced and incorrect. There is no suggestion in this record that DCYF did not intend to file a TPR petition. Rather, the record is abundantly clear that DCYF was waiting until it received the crucial records from the Commonwealth of Massachusetts—which contained a plethora of evidence of mother's lengthy history of substance abuse, child abuse and neglect including multiple previous terminations, and domestic violence at the hands of her partner, Adele's father—to file the TPR petition.

In denying the motion to recuse, the Family Court justice noted that, other than directing DCYF to file the TPR petition, which in light of the travel of this case was reasonable, the Court had made no other pretrial ruling. She also declared that she "had no biases or prejudices, other than the amount of the time that has gone by." As she stated, it remained for DCYF to prove the case.

This Court has held that "adverse rulings alone do not show bias or prejudice on the part of the trial justice." *In re Antonio*, 612 A.2d 650, 654 (R.I. 1992) (quashing an alternative writ of mandamus requiring recusal of the Chief Judge of the Family Court where petitioner argued the Chief Judge displayed bias and an inclination toward premature judgment on the basis of various rulings). While the Family Court justice's ruling may have had the unfortunate result of respondent feeling that she was disadvantaged, based on the record before us, we are of the opinion that the order to file the TPR petition within a certain period of time, standing alone, did not jeopardize the Family Court justice's ability to render a fair decision. Nor would a reasonable person question the Family Court justice's impartiality in these circumstances. *In re Amelia*, 655 A.2d 256, 256 (R.I. 1995) (mem.) ("Only in those instances where it can be determined that a reasonable person would question the trial justice's impartiality should a motion to recuse be granted.").

Additionally, respondent failed to meet her burden of setting forth facts establishing bias on the part of the Family Court justice during this proceeding. *See Mlyniec*, 15 A.3d at 999. The respondent suggests that the Family Court justice's order would cause a reasonable person to question the impartiality of the resulting proceedings; yet she overlooks the basis for the order—DCYF's failure to obtain the records from Massachusetts—and significantly, that the petition was filed by DCYF when the records were obtained. As DCYF argued before this Court: "To be

clear the Department never stated that it was *not* going to file a termination petition. The trial attorney stated that she was 'waiting,'" and that during the May 28, 2015 permanency hearing, "[t]he Department was simply asking for more time to obtain the necessary documentation prior to filing its petition." The record clearly supports DCYF's position on this issue.

Finally, the only additional evidence offered on the issue of bias consisted of a handful of quotes from the trial record, alleged to establish an inference of bias on the part of the Family Court justice. We are not persuaded. When a trial produces nearly 1,000 pages of transcripts, as is the case before us, any number of remarks by the trial judge can be pulled from the record, most of which are directed at or to the other lawyers. The party seeking relief must affirmatively establish "that the judicial officer possesses a personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his or her impartiality seriously and to sway his or her judgment." *State v. McWilliams*, 47 A.3d 251, 260 (R.I. 2012) (brackets omitted) (quoting *Mattatall*, 947 A.2d at 902). Here, respondent failed to affirmatively establish bias on the part of the Family Court justice, who, given the complexity of the facts and issues involved, presided over a complex proceeding with difficult facts and a chameleonic respondent.

We agree with the Family Court justice that the order directing DCYF to undertake termination proceedings within a certain period of time was warranted; Adele had been in the custody of DCYF for more than two years, without permanency, based on respondent's extensive history and imprisonment in Massachusetts. After her release from prison, respondent's interactions with Adele were limited to biweekly, supervised visits. The court's order precipitated the delivery of the record of respondent's history in Massachusetts, horrific and damning as it was. Because there was no sound reason for the Family Court justice to recuse

in this case, we are of the opinion that she had an obligation not to do so, and we affirm her denial of respondent's motion to recuse.

## Termination of Respondent's Parental Rights

Next, we turn to respondent's appeal from the decision terminating her parental rights. Specifically, respondent argues that the Family Court justice erred in finding, by clear and convincing evidence, that she was an unfit parent, and her conclusion that there was clear and convincing evidence that it was in Adele's best interests for respondent's parental rights to be severed.[11] After carefully reviewing the Family Court record and filings of counsel, we conclude that legally competent evidence exists to support the findings of the Family Court justice.

## Parental Fitness

"A parent is deemed unfit when the parent has 'exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time.'" *In re Violet G.*, 212 A.3d at 166 (brackets omitted) (quoting G.L. 1956 § 15-7-7(a)(2)(vii)). Moreover, "[a] finding of parental unfitness under § 15-7-7(a)(2) made by a trial justice is 'entitled to great weight and will not be disturbed on appeal unless it is clearly wrong or the trial justice misconceived or overlooked material evidence.'" *Id.* (brackets omitted) (quoting *In re Jennifer R.*, 667 A.2d 535, 536 (R.I. 1995)).

In reaching her conclusions, the Family Court justice pointed to respondent's ongoing and sub-rosa relationship with Clark and its impact on her lack of fitness as a parent, especially in light of the substantial amount of domestic violence that she endured over a span of years and then downplayed and minimized to all service providers. Specifically, the Family Court justice

---

[11] There was no dispute between the parties that DCYF had made reasonable efforts at reunification. As such, the second stage of the three-step process described in *In re Steven D.*, 93 A.3d 978, 984 (R.I. 2014), discussed *supra*, is not addressed here.

- 20 -

found by clear and convincing evidence that respondent and Clark had a history of domestic violence and had five children together; that respondent permitted Clark to pose for a picture with Adele in his arms in violation of her case plan; and that respondent continued to have ongoing contact with Clark, by telephone and in person. It is abundantly clear that respondent's case plans and service providers indicated that she was to have no contact with Clark and that, if Clark made contact with her, she was to notify the police. However, respondent never notified the police, and she made less-than-candid disclosures to her service providers about her contacts with Clark, leaving out key details, such as the photograph with Adele, which she obviously treasured.

The respondent advances several arguments in support of her contention that the Family Court justice erred in finding unfitness by clear and convincing evidence. The respondent contends that the Family Court justice erred because her "witnesses all testified, in mainly glowing terms, about her commitment to recovery and her ability to parent Adele." While the commitment that respondent made to her sobriety is commendable, such commitment alone does not establish fitness as a parent, particularly when contrasted with poor judgment and questionable capacity to protect her child.

The respondent also contends that the Family Court justice erred by finding she "never actually took responsibility for the injuries that occurred to [Troy,]" injuries for which she was found guilty after trial. The parties spent a great deal of time in the Family Court arguing over whether respondent accepted responsibility for Troy's injuries and what impact that may or may not have on her fitness as a parent.

The respondent also argues that the Family Court justice erroneously found that respondent "took advantage of every opportunity she could to have contact with Mr. Clark." The

respondent suggests to this Court that, although she has a "lingering emotional attachment" to Clark, she has accepted that her relationship with Clark is over. The record demonstrates otherwise. A finding that an ongoing relationship between respondent and Clark continued at the time of trial, such that her capacity to protect Adele was seriously questioned by service providers, and was established by the social media posts and three-hour luncheon encounter the month before trial.

The record in this case contains legally competent evidence that respondent has exhibited behavior that is seriously detrimental to Adele for such a duration as to render it improbable that she will be able to care for Adele for an extended period of time. Despite the various forms of domestic violence treatments she underwent, on the first day of her criminal trial in Quincy, Massachusetts, she met with Clark and permitted him to hold the child and pose for pictures. There is no evidence in the record that respondent has the judgment or capacity to safely parent this child. It does not escape our notice that the bulk of the evidence about respondent's lack of protective capacity for Adele came to light after the Family Court justice ordered DCYF to file the TPR petition.

The lengthy record in this case indicates that respondent has made progress toward resolving some of the substance abuse issues she has endured for most of her life. However, with respect to her fitness as a parent to Adele, this progress is tenuous at best, particularly in the face of her social media postings immediately before trial. Adele is respondent's seventh child. At least five of these children have been negatively impacted because of respondent's history with Clark. The relationship between respondent and Clark is simply too dangerous a gamble in the circumstances of this case. As the Family Court justice found, this record indicates that it is improbable that respondent will be able to care for Adele for an extended period of time. *See In*

*re Violet G.*, 212 A.3d at 166; *see also* § 15-7-7(a)(2)(vii). The record is replete with legally competent evidence to support the Family Court justice's finding, by clear and convincing evidence, that respondent is an unfit parent. We affirm this finding.

### The Best Interests of the Child

After a determination of parental unfitness is found in a case involving the termination of parental rights, the analysis shifts to the overarching issue of the best interests of the child. *In re Violet G.*, 212 A.3d at 167. This determination "outweighs all others." *Id.* The best interests of the child analysis always focuses on the rights of the child "to reasonable care and maintenance, freedom from abuse or neglect, and an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive." *In re David L.*, 877 A.2d 667, 673-74 (R.I. 2005) (deletion and brackets omitted) (quoting *In re Raymond C.*, 864 A.2d 629, 634 (R.I. 2005)).

In the case before us, the Family Court justice found that "[t]he [t]ermination of [p]arental [r]ights of [respondent] * * * is in the best interest of the minor child[,]" and that Adele currently resides "in a foster home which is a pre-adoptive home and the child is bonded and flourishing in that home." The respondent contends that these findings were erroneous because, she asserts, "while there was plenty of evidence on the record that [respondent] could provide a safe and happy home for her daughter, there was no evidence on the record about the suitability of the pre-adoptive home." We are not persuaded by either of these contentions.

The Family Court justice made several findings, all of which are supported by legally competent evidence, including that respondent had never lived independently with Adele and that respondent has only resided in various programs or shelters. The Family Court justice found that respondent and Adele had always been in a supervised setting and that respondent did not

seek employment until after the TPR petition was filed. Simply put, respondent has never demonstrated that she is capable of caring for Adele on her own and has never legally been permitted to do so. As for the lack of evidence on the record about the suitability of the pre-adoptive home, this argument is not relevant; "placement in a pre-adoptive home is not a prerequisite for a termination of parental rights." *In re David L.*, 877 A.2d at 673. While additional testimony about Adele's status in her foster home might have been helpful, it was not required, and the evidence before the Court clearly militated in favor of termination.

"Although we remain mindful of the 'significance of severing the bond between parent and child,' we are satisfied that the evidence presented in this case supported the termination of the respondent's parental rights." *In re Violet G.*, 212 A.3d at 168 (quoting *In re Alexis L.*, 972 A.2d 159, 170 (R.I. 2009)). On March 28, 2020, Adele turned seven years old, but has never lived with the respondent in an unsupervised setting. Adele deserves to continue the remainder of her childhood in a safe and nurturing environment. Accordingly, after careful review of the record, we are satisfied that the Family Court justice's findings are not clearly wrong and that she did not overlook or misconceive material evidence. We therefore decline to disturb her finding that termination of the respondent's parental rights was in the best interest of Adele.

## Conclusion

For the reasons stated herein, we affirm the decree of the Family Court terminating the respondent's parental rights with respect to her daughter, Adele. The papers may be remanded to the Family Court.

**Justice Robinson, concurring in part and dissenting in part.** I feel compelled to record my respectful but vigorous partial dissent from the Court's opinion in this admittedly

complex and difficult case.[1]  After thoroughly examining the record and the arguments of counsel, and after considering at length the competing values that this case implicates, I am simply unable to agree with my colleagues that the evidence presented at trial was sufficient to support the trial justice's determination that Marybeth Boyd was unfit to parent Adele B. (Adele) and that her parental rights should be terminated.

While I acknowledge that this Court invariably accords a considerable degree of deference to a trial justice's findings relative to the issue of unfitness, it nonetheless must be constantly borne in mind that, in conducting such a review, we must be keenly aware of the demanding evidentiary standard of clear and convincing evidence that has been mandated as the minimum standard of proof by the United States Supreme Court with respect to proceedings of this type.  *See Santosky v. Kramer*, 455 U.S. 745, 769-70 (1982).  It is imperative to remember that a fundamental liberty interest is at stake in a case such as this.  *See id.* at 753.  For that reason, "persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." *Id.*  When the Supreme Court held that due process mandates that findings in termination of parental rights proceedings rise, at a minimum, to the level of clear and convincing evidence, the Court reasoned that such a heightened standard of proof "would alleviate 'the possible risk that a factfinder might decide to [deprive] an individual [of those rights] based solely on a few isolated instances of unusual conduct [or] * * * idiosyncratic behavior." *Id.* at 764, 769-70 (quoting

---

[1]  While I am dissenting from this Court's decision upholding the finding of unfitness and the consequent termination of parental rights, I agree, albeit *dubitante*, with this Court's ruling that, under the circumstances of this case, it was not necessary for the trial justice to recuse herself.

*Addington v. Texas*, 441 U.S. 418, 427 (1979)).[2]  Moreover, this Court, also recognizing the need for greater procedural protections in this context, has expressly stated that "[n]atural parents have a fundamental liberty interest in the care, custody, and management of their child that does not evaporate if they are not model parents or have lost temporary custody of their child."  *In re Antonio G.*, 657 A.2d 1052, 1057 (R.I. 1995) (citing *Santosky*, 455 U.S. at 753).

Additionally, it is important to remember the following significant jurisprudential principle: "The phrase 'clear and convincing evidence' is more than a mere exercise in semantics.  It is a degree of proof different from a satisfaction by a 'preponderance of the evidence' which is the recognized burden in civil actions * * *."  *Parker v. Parker*, 103 R.I. 435, 442, 238 A.2d 57, 60-61 (1968).  This Court has reiterated that "the clear and convincing standard is significant[,] and requires that the fact-finder form a clear conviction without hesitancy of the truth of the precise facts in issue."  *In re Sophia M.*, 204 A.3d 605, 609 (R.I. 2019) (internal quotation marks omitted); *see Luis v. Gaugler*, 185 A.3d 497, 506 (R.I. 2018); *see also Cahill v. Morrow*, 11 A.3d 82, 88 n.7 (R.I. 2011) ("Clear and convincing evidence is defined in a variety of ways; * * * a party must persuade the jury that the proposition is highly probable, or must produce in the mind of the factfinder a firm belief or conviction that the allegations in question are true.") (quoting 29 Am. Jur. 2d *Evidence* § 173 at 188-89 (2008)).  In other words, "[e]vidence that is clear and convincing requires a stronger showing than merely substantial evidence."  32A C.J.S. *Evidence* § 1624 (Mar. 2020 Update).  Accordingly, in conducting our appellate review, while we do accord our customary deference to the findings of the *nisi prius* court, we must also evaluate the trial justice's decision through the lens of the clear

---

[2]  It is interesting to note that our sister state of New Hampshire requires that findings in termination of parental rights cases be made pursuant to the even higher evidentiary standard of beyond a reasonable doubt.  *See In re Lisa H.*, 589 A.2d 1004, 1006 (N.H. 1991); 1 Children & the Law: Rights and Obligations § 3:22 (May 2020 Update).

and convincing standard and determine whether there was sufficient evidence in the record to meet that standard. I respectfully submit that that daunting standard has not been met in this case.

As the majority correctly observes, the Department of Children, Youth, and Families (DCYF) alleged that Marybeth was unfit pursuant to G.L. 1956 § 15-7-7, subsection (a)(3) of which requires that the trial court find by clear and convincing evidence that "there is not a substantial probability that the child will be able to return safely to the [parent's] care within a reasonable period of time considering the child's age and the need for a permanent home * * *." Importantly, DCYF did not allege any other statutory basis that might conceivably have served as a basis for a finding of unfitness. Thus, the trial justice's role was to look at the circumstances present at the time of trial and determine whether such circumstances rendered Marybeth unfit to parent Adele under the above-cited statutory section. Even in light of the deference which we accord a trial justice's factual finding in this domain, it is my opinion that the evidence presented at trial was not sufficient to support the trial justice's conclusion that Marybeth was unfit to parent Adele, especially in consideration of the clear and convincing evidence standard.[3]

Both my colleagues in the majority and the trial justice have focused almost entirely on Marybeth's troubled history, while largely passing over in silence the impressive amount of positive evidence in the record regarding her substantial and laudable progress in all treatment areas (and not solely in the area of substance abuse). Virtually all of Marybeth's providers indicated that she had made significant progress in meeting her case plan goals, which included: (1) participating in domestic violence counseling; (2) maintaining a safe environment for Adele; and (3) maintaining sobriety.

---

[3]    Indeed, I am of the view that even the less demanding "preponderance of the evidence" standard was not met in this case.

For example, Nora Henley, Marybeth's DCYF social caseworker, testified as follows:

> "[Marybeth] seemed eager to participate in services. She was open
> to advice. She was open to services. She was willing to meet with
> whomever asked her to. She was open in her discussion of her past
> history."

Laura McKiernan, Marybeth's DCYF social caseworker supervisor, testified that Marybeth accomplished all of the case plan goals of her first case plan except with respect to employment, which Ms. McKiernan stated was not a concern to her at that time. Ms. McKiernan also testified that Marybeth was participating with the services that were put in place with the case plan implemented after Marybeth was released from prison, which listed a goal of reunification.

Moreover, the uncontested evidence at trial showed that, at the time of trial, Marybeth had been sober for over two years. Rosemary Soave, the Coordinator of the Rhode Island Family Treatment Drug Court, testified that Marybeth complied with the program requirements—both while she was living at SSTARbirth and after she transitioned to the Amos House Mother-Child Reunification program.

Susan Dounetos, the program coordinator for the Mother-Child Reunification program when Marybeth was a resident, memorably testified that, in July of 2014, "[Marybeth] had been complying with everything that DCYF was asking her to do" and that "[s]he was doing everything that [the Mother-Child Reunification program] had asked her to do * * *." Ms. Dounetos further described Marybeth as a "role model" for the other mothers in the program in many respects. It is also clear from the testimony at trial that Marybeth and Adele were well-bonded prior to the filing of the termination of parental rights petition. Importantly, up to the point when the trial justice ordered DCYF to file a termination of parental rights petition, DCYF

was making active efforts to achieve the case plan goal of reunifying Adele with Marybeth based on Marybeth's cooperation with services and the favorable reports from providers.[4]

I also note that Marybeth made great efforts to maintain contact with Adele during her incarceration in Massachusetts, and she continued to take steps aimed at putting herself in a better position to be reunified with Adele upon her release, despite having significant barriers to doing so. The trial justice chose to minimize the nature of Marybeth's efforts in this regard, stating that, during her incarceration, Marybeth "had no contact with the minor child except through books and notes that were sent to the social case worker and then read to the one and a half (1 1/2) year old child." In my judgment, such a statement is a product of the trial justice having misconceived the import of the evidence; it is clear to me that sending books and notes is a commendable and caring form of contact regardless of the child's age. Additionally, and importantly, Marybeth's social caseworker testified that she was not able to bring Adele to the prison for a face-to-face visit with Marybeth because she was not permitted to transport Adele across state lines. I further note that Marybeth completed two programs while in prison and also arranged suitable housing for both her and Adele upon her release. Ms. McKiernan agreed

---

[4]    The majority indicates that the only reason that DCYF did not file a termination of parental rights petition prior to the time when the trial justice ordered that agency to do so was because it was awaiting receipt of the relevant records from Massachusetts. However, the record reflects that there was another reason for DCYF having decided not to file a termination of parental rights petition at that time—namely, *because of Marybeth's ongoing cooperation with services*. At the May 28, 2015 hearing in the Family Court, counsel for DCYF forthrightly stated:

> "I met with my workers and the supervisor, I made a determination that I could not presently prove unfitness, and that is my determination -- it would be the Department's petition. I spoke with the worker -- based on the cooperation since the opening of this case. I understand the concerns. I understand the concerns about this history. But I also know this is not a punitive court."

during her testimony that Marybeth "got herself situated in the best place possible to effectuate reunification" after incarceration. Then, approximately one month after Marybeth returned to Rhode Island following her release from incarceration, the trial justice ordered DCYF to file a termination of parental rights petition.[5] In this regard, Marybeth's situation is starkly distinguishable from that of the respondent in *In re Lyric P.*, 90 A.3d 132 (R.I. 2014), whom the trial justice found was unfit to care for his child following his release from prison because "he would not be ready to take the child, as respondent 'ha[d] offered no practical explanation' as to how he would take care of the child." *In re Lyric P.*, 90 A.3d at 140.

Further, the record does not support the trial justice's finding that Marybeth "took advantage of every opportunity she could to have contact with Mr. [Samuel] Clark." There is no evidence in the record that Marybeth initiated contact with Mr. Clark at any point after Adele entered the custody of DCYF. Marybeth conceded while testifying that she saw Mr. Clark in person on three occasions: (1) outside the courthouse in Quincy, Massachusetts, on the first day of her criminal trial; (2) at the Family Court in Rhode Island on the first day of the trial on the termination of parental rights petition, which petition was directed toward *both* Marybeth and Mr. Clark; and (3) at the time of a bereavement service in honor of her own brother-in-law. As to the encounter on the first day of her criminal trial in Quincy, Marybeth was certainly not there for the purpose of seeing Mr. Clark, and there is absolutely no evidence that she had requested him to be there. Although, admittedly, Marybeth should not have permitted Mr. Clark to hold

---

[5] In light of Marybeth's efforts and the recommendations of her providers, I fail to understand how approximately one month can be deemed an adequate amount of time for the trial justice to determine that filing a termination of parental rights petition was appropriate. I am frankly troubled by the trial justice's arguably peremptory decision to require DCYF to move forward with termination proceedings when, according to DCYF and her providers, Marybeth had been cooperating with services for over a year and no circumstances existed at the time to indicate that Adele could not have been reunified with Marybeth in a reasonable amount of time.

Adele on that day, such an isolated and brief incident in a public place does not amount to meaningful evidence that Marybeth is unable to protect Adele. Similarly, Marybeth was required to attend her termination of parental rights trial, and failing to do so would have been harmful to her case. As to the bereavement service, the service was for Marybeth's own family member—not a family member or close friend of Mr. Clark's—and Marybeth's testimony reflected the fact that she did not inform Mr. Clark about the service and that she did not know in advance that he would be there.

Although Marybeth testified that Mr. Clark called her about once a month, there is no evidence that Marybeth initiated any of those telephone calls. With respect to Marybeth's social media postings about Mr. Clark, the testimony at trial indicated that none of the pictures was taken in the recent past. The most recent photograph was the one taken on the first day of her criminal trial in Massachusetts, which was prior to her incarceration. Even Rebecca Carter, who conducted a parent-child evaluation and found the social media postings to be concerning, conceded that posting photographs that are two or three years old is not evidence of an ongoing relationship. The testimony about the social media postings does not support the conclusion that Marybeth and Mr. Clark were in an ongoing relationship of such a nature as to expose Adele to harm. Accordingly, in my judgment, the trial justice misconceived the evidence with regard to Marybeth's relationship with Mr. Clark.

The trial justice also based her decision on a finding that Marybeth "has never taken responsibility for Troy's injuries." While failing to take responsibility for past abuse can be a relevant evidentiary fact as a trial justice addresses the unfitness issue, such a finding in this case is completely unsupported by the record. *See In re Victoria L.*, 950 A.2d 1168, 1172, 1175 (R.I. 2008) (upholding "a trial justice's finding that a respondent ha[d] not demonstrated a changed

attitude or lifestyle sufficiently to be considered a fit parent" when the respondent's parental rights as to a different child had previously been involuntarily terminated based on past abuse). At trial, Marybeth testified: "I chose to go to trial not because I don't feel as if I'm responsible, because I did [feel responsible], because I'm his mother, and I should have protected him." Alan Whelan, Marybeth's case manager at Children's Friend and Services, testified that Marybeth told him that what happened to Troy was her fault because she was the mother. It was further his testimony that "[s]he blames herself for allowing the situation, the environment, to happen." Nora Henley testified that Marybeth "felt responsible for not supervising her infant appropriately and him getting injuries as a result." Thus, unlike the mother in *In re Kelly S.*, 715 A.2d 1283 (R.I. 1998), regarding whom this Court upheld a termination of her parental rights stating that she had continually failed "to accept responsibility for her prior conduct, which contributed to the horrific abuse of her two older children," Marybeth took responsibility for Troy's injuries— both during her testimony at her termination of parental rights trial and when she admitted to at least two of her service providers that she was at fault for the incident. *See In re Kelly S.*, 715 A.2d at 1288. Moreover, in *In re Kelly S.*, "no fewer than three witnesses testified that mother repeatedly and adamantly denied sexually abusing her older children." *Id.* Here, by contrast, multiple witnesses testified that Marybeth *did take responsibility* for what happened to Troy. The trial justice made much of the fact that Marybeth consistently stated that her older son, Giovanni, was the person who physically caused Troy's injuries. However, I am unable to understand how this statement indicates that Marybeth was somehow not taking responsibility for the charge for which she was convicted—namely, *permitting* injury to a child.

Lastly, as I read the record, it is clear that the trial justice misconstrued the evidence in finding that Marybeth made a "calculated decision to keep certain information from her

providers in order to stay in their good graces * * *." Marybeth's providers were aware of her extensive history of domestic violence and substance abuse; and they were also aware of the injuries to Troy. In addition, they were further aware of the fact that Marybeth has older children that are no longer in her care. There is absolutely no evidence in the record that Marybeth was evasive in this regard. In fact, both Mr. Whelan and Ms. Henley described Marybeth as having been "open" during their conversations with her about her history. Although Marybeth did not inform her providers of every interaction with Mr. Clark, she did inform Ms. Henley and Ms. Dounetos that she had encountered Mr. Clark on the first day of her criminal trial. In addition, the record reflects that Ms. Henley acknowledged that she knew of at least one possible phone call between Mr. Clark and Marybeth. While it is true that Marybeth was instructed to have no contact with Mr. Clark, the minimal contacts that she did have—again, not initiated by her—are, in my view, not sufficient to properly trigger such a concern for Adele's well-being as to support a finding that Adele could not be returned to Marybeth's care within a reasonable amount of time.

At the risk of seeming to be overly rhetorical or "philosophical," I think it appropriate to comment that a basic presumption of our jurisprudence is that most humans are capable of improving themselves—of returning to the straight path after having wandered away from it for a while. I firmly believe that that consideration is directly relevant to termination of parental rights cases. In this area of the law (as in many others), it is vitally important that we believe in (and act on) the assumption that people can change for the better.[6] One of the purposes of the procedural and evidentiary protections that accompany termination proceedings is to make sure

---

[6] I do not naively suggest that such change for the better happens in every instance—or even in most instances. My simple point is that reasonable allowance must be made for the possibility of such change. A certain degree of respect should be accorded to those who are genuinely striving to change for the better.

that the past shortcomings of a parent are not given undue weight when that person is exhibiting palpable signs of having returned to the straight path. If we lose sight of that fundamental insight, the procedural protections provided to parents whose children are under DCYF care and the services that DCYF and other community supports provide to those parents would be all for naught. Marybeth's efforts to turn her life around and become a good and fit mother for Adele are laudable, as recognized by virtually all of her service providers. For that reason, this case is markedly different from so many of the termination of parental rights cases that have come before this Court, cases in which one or both parents were unwilling or unable to rectify the problems that led to DCYF involvement. *See, e.g.*, *In re Evelyn C.*, 68 A.3d 70, 71-82 (R.I. 2013); *In re Charles L.*, 6 A.3d 1089, 1090-95 (R.I. 2010); *In re Brooklyn M.*, 933 A.2d 1113, 1115-27 (R.I. 2007); *In re Kayla N.*, 900 A.2d 1202, 1203-12 (R.I. 2006).

While Marybeth may not be the perfect parent at this point in time, this Court has repeatedly acknowledged that "[a]bsent a finding of unfitness, the natural parents['] right to bear and raise their child in a less than perfect way remains superior to the rights of foster parents who may be exemplary nurturers." *In re Amber P.*, 877 A.2d 608, 615 (R.I. 2005) (internal quotation marks omitted); *see also In re Antonio G.*, 657 A.2d at 1057. Thus, Marybeth was not required to prove that she is or has always been a perfect parent in order to retain her right to parent Adele.

I do not pretend to know with certainty whether Marybeth will ultimately show herself able to parent Adele to an acceptable extent. I do know, however, that Marybeth deserves the right to show that she is capable of doing just that.[7] My hope that that will be the result is not

---

[7]     I am well aware that the path that I propose entails some degree of risk to Adele, and I am not insensitive to that. In my judgment, however, respect for Marybeth's liberty interest as

chimerical but is founded on the real progress that she has made—progress that has been documented and applauded by numerous providers. It is my firm opinion that DCYF failed to present sufficient evidence to support the trial justice's finding by clear and convincing evidence that Marybeth was unfit to parent Adele. In my considered judgment, termination of Marybeth's constitutionally-derived liberty interest at this juncture is premature and regrettable. For that reason, it is my unblinking conviction that Marybeth's parental rights were wrongfully terminated. Accordingly, I would vacate the decree of the Family Court, and I therefore respectfully dissent.

---

Adele's parent makes taking that risk acceptable—especially in view of Marybeth's documented progress and the fact that numerous safeguards are in place.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Adele B. |
| **Case Number** | No. 2016-87-Appeal. (13-446-1) |
| **Date Opinion Filed** | June 17, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Karen Lynch Bernard |
| **Attorney(s) on Appeal** | For Petitioner: <br><br> Shilpa Naik <br> Court Appointed Special Advocate <br><br> Karen A. Clark <br> Department of Children Youth and Families |
| | For Respondent: <br><br> Angela M. Yingling <br> Office of the Public Defender |